COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, McClanahan and Senior Judge Coleman


CASSIE GREENWAY

MEMORANDUM OPINION[*] BY

v.      Record No. 2650-05-3          JUDGE SAM W. COLEMAN III
                                                JUNE 13, 2006

CRAIG COUNTY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF CRAIG COUNTY
Diane McQ. Strickland, Judge Designate

(Thomas E. Wray, on brief), for appellant.  Appellant submitting on
brief.

(Carolyn H. Furrow, on brief), for appellee.  Appellee submitting on
brief.

(Robin Dearing, Guardian *ad litem* for the infant child, on brief).
Guardian *ad litem* submitting on brief.


Cassie Greenway contends the trial court erred in terminating her parental rights to her

minor child, T., because the Craig County Department of Social Services ("DSS") did not

present clear and convincing evidence that she failed to correct the conditions which led to T.'s

removal.  For the reasons stated below, we affirm the trial court's decision.

Facts

On appeal, we view the evidence in the light most favorable to the prevailing party below

and grant to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County

Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1992).  T. was born on

February 14, 1999, to Greenway and Clifton Matson.  Although the record does not indicate

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

when, at some point Greenway entered into a relationship with Darrell Greenway when T. was a few months old. The two ultimately married when T. was two years old. Shortly after their marriage, Greenway left Darrell during an incident of domestic violence in July 2001 and she took refuge in the home of Robert and Elisha Fisher.

When social worker Bill Burleson interviewed Greenway in the Fisher home, she told him she had left Darrell because he had threatened her and her son with a knife. Burleson determined Greenway was sleeping on a sofa in the Fishers' living room, and T. was sleeping on the sofa or on the carpeted floor next to her. The carpet had "numerous spots where the Fishers' cat had soiled [it]," and "the entire house smelled of feces and urine." Furthermore, while there was food in the refrigerator, "it consisted . . . mostly of a chocolate drink." Greenway's only income was approximately $69 a week in child support from T.'s father. Based upon these conditions,[1] Burleson obtained an emergency removal order for T. on grounds of abuse and neglect.

DSS records describe Greenway as "developmentally delayed." At the initial hearing in August 2001, the guardian *ad litem* for T. requested additional time to "more fully investigate the matter of custody," and the case was continued. Greenway and T.'s biological father, Matson, were ordered to complete a "Trans-Parenting Class,"[2] and Greenway was granted weekly visitation, to be supervised by her father, John Aldridge.

---

[1] Burleson's review of social service records also disclosed that founded complaints for physical abuse had been brought against the Fishers in connection with children they were babysitting.

[2] While the record is unclear, this does not appear to be the same parenting class which DSS claims Greenway did not complete after the juvenile court terminated her parental rights. According to Greenway's certificate of attendance, dated August 24, 2004, the class she attended to comply with DSS requirements was entitled "Parenting: The Early Childhood Years."

T. was placed in the custody of Linda Mansberry, one of Greenway's relatives. Mansberry had helped Greenway with T.'s care from the time he was a few months old. The placement with Mansberry continued until February 2002, when Aldridge made DSS aware of a criminal conviction Mansberry had failed to disclose. As a result, T. was placed with foster parents Kevin and Pat Craft, and has remained in their custody since that time. [3]

DSS filed a service plan with a stated goal of "return home" in June 2002. DSS noted that "services . . . [would] be provided which [would] address the needs identified . . . [i.e.], improve conditions [in] the parents' home and facilitate return of the child home." Specifically, the plan noted that the "parents [would] be given the opportunity to attend parenting classes." Greenway and Darrell had to maintain jobs, and Greenway had to show "the ability to care for a small child."

By April 2003, Greenway had not completed the parenting class, but she did comply with the juvenile court's order for a psychological evaluation in July 2003. The evaluation, completed by Dr. Doris Nevin, revealed Greenway had an IQ of 65. Dr. Nevin testified Greenway was mildly mentally retarded and recommended further therapy to assist her with "some of her cognitive and . . . emotional difficulties . . . ."[4] Nevin expressed concern about Greenway's "mental abilities in terms of her ability to take care of herself and to manage practical activities . . . [such as] writ[ing] out bills and pay[ing] them . . . [b]eing able to plan a menu and provide for herself a nourishing diet." Nevin stated Greenway would require support to parent T. adequately, qualifying that opinion by noting she did not know whether T. had any "special needs."

---

[3] According to the December 2001 service plan, T. was the subject of a custody battle "between the mother, father, grandfather, stepfather, and friend of the family."

[4] Nevertheless, Greenway denied needing any services at the time of her psychological evaluation or at the time of the termination hearing.

In fact, T. had serious behavioral problems which resulted in his being placed in counseling in 2002. Specifically, T. exposed himself to other children at daycare, and singled out specific children with this behavior. His teacher, Dreama Kirby, noticed that T. was sometimes more aggressive with other children after visits with Greenway and her family. The director of the daycare center, Teresa Oliver, testified that T. had to be terminated from the program in November 2003 due to his misbehavior.

Meanwhile, T. told his counselor, Kathleen Bagby, in the spring of 2003 that John Aldridge had sexually abused him. These charges were determined to be founded. As a result, visitation with Aldridge was terminated, and Aldridge was no longer able to supervise Greenway's visitation. DSS attempted unsupervised visitation between Greenway and T. during the summer of 2003, but following the visitation, T. returned to daycare with a red and irritated penis. T. told Bagby in July 2003 that Greenway had showed him that "if you rub [your penis], it gets bigger." The next month, Pat Craft told Bagby that T. had "exposed himself" at daycare. Visitation with Greenway was suspended in September 2003, and sexual abuse charges were brought against her. Greenway pleaded "no contest" to these charges in December 2003.

DSS changed its goal to adoption and prepared a petition for the termination of Greenway's parental rights. The stated reasons for its change in position were the sexual abuse charges and Dr. Nevin's psychological assessment that Greenway was unable to care for a small child. On March 8, 2004, the juvenile and domestic relations district court ("juvenile court") terminated Greenway's parental rights, and she appealed to circuit court. The circuit court held several hearings, the last of which took place on May 27, 2005.

Burleson testified that Greenway had "significant reduced mental capacity" and "a very poor work record." He emphasized that she refused to attend the parenting class,[5] even though T.'s return was conditioned upon her completion of the class. At one point, Greenway lived only one block from the building where the class met.

When asked why DSS changed its goal to termination in the fall of 2003, Burleson stated:

> Because the child's father had already terminated his parental rights, and with the things going downhill with Cassie, visitation being suspended by the court order, the child had been in foster care almost three years at that point, maybe even over three years at that point, it just wasn't working and it was time to move on to the next step.

Carl Bailey testified concerning his observations of Greenway's parenting skills. Bailey, manager of the apartment complex where she lived when T. was two years old, stated that he became alarmed when he saw T. unsupervised on the second floor balcony to Greenway's apartment. Bailey related that "[T.] had crawled up in a chair and was at the top of the banister." Bailey honked his car horn, and Greenway came out on the balcony. She told Bailey that T. was "all right, that he just liked to climb."

Bagby testified that T.'s behavior had improved during the six months before the hearing. She stated that "he's doing very, very well . . . [and that] we are not seeing the sexual behavior, the angry outbursts, he's in a very calm place . . . ." She also noted he had become "very, very attached" to the Crafts.

Analysis

"When reviewing a decision to terminate parental rights, we presume the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46

---

[5] Greenway finally completed the parenting class on August 24, 2004, more than six months after her parental rights were terminated by the juvenile court.

Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). In its role as fact finder, the circuit court has "'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. at 266, 616 S.E.2d at 769 (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

The circuit court's order indicates it terminated Greenway's parental rights "pursuant to Section 16.1-283(a) of the Code of Virginia." The court's order refers to subpart (a) of Code § 16.1-283(B)(2), which provides for termination of parental rights of a "neglected or abused" child if the court finds,

> based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> \*     \*     \*     \*     \*     \*     \*
>
> [i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. . . .
>
> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> a. The parent or parents are suffering from a mental . . . deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development[.]

Under subsection B, parental rights may be terminated upon a showing of clear and convincing evidence that termination is in the child's best interests, that the neglect and abuse suffered by the child presents a serious and substantial threat to his life, health, or development, and that it is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent within a reasonable period of time. Toms, 46 Va. App. at 266, 616 S.E.2d at 769.

- 6 -

While "the rights of parents may not be lightly severed," M. G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 187, 583 S.E.2d 761, 769 (2003) (citation omitted), the "paramount consideration" of the court is the "child's best interests." Akers v. Fauquier County Dep't of Soc. Servs., 44 Va. App. 247, 262, 604 S.E.2d 737, 744 (2004) (citation omitted). As borne out by both Greenway's psychological assessment and her sexual abuse of T., the trial court found that Greenway's mental deficiency is such that "there is no reasonable expectation that [she] will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development." Code § 16.1-283(B)(2)(a).

"Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past.'" Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (quoting Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003)). Based upon Greenway's history, we find no error in the trial court's decision to terminate her parental rights. Dr. Nevin's conclusion that Greenway lacked the ability to parent T. without assistance was borne out by her own behavior. Greenway consistently made choices which were not in T.'s best interests: admittedly breaking a car window in a fit of anger as she held T. in her arms; leaving him unattended on a second floor balcony; allowing him to sleep on carpet soiled with feces; and exposing him to a family known to be abusive to children. Given the opportunity to have unsupervised visitation with her son, Greenway sexually abused him. Despite the foregoing, Greenway testified she did not need counseling services and refused to attend parenting classes until after her parental rights were terminated.

Furthermore, T. exhibited behavioral problems which required especially skillful parenting. Notably, these problems improved during the six months prior to the termination hearing, the same time frame during which visitation with Greenway had ceased. At the time of the termination hearing, T. was six years old and had been in foster care for over four years.

Based upon the foregoing, we affirm the trial court's decision terminating Greenway's residual parental rights.

Affirmed.