COURT OF APPEALS OF VIRGINIA


Present:    Judges Kelsey, Petty and Senior Judge Bumgardner


GERRI OLIVER

                                                    MEMORANDUM OPINION[*]
v.        Record No. 0669-06-3                         PER CURIAM
                                                    OCTOBER 10, 2006
ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES


                  FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                              Charles N. Dorsey, Judge

            (L. Brad Braford; L. Brad Braford, P.C., on brief), for appellant.

            (William M. Hackworth, City Attorney; Heather P. Ferguson,
            Assistant City Attorney, on brief), for appellee.

            (Joseph F. Vannoy, on brief), Guardian *ad litem* for the minor
            children.


        Gerri Oliver (mother) appeals the decision of the circuit court terminating her parental rights

to her three children, C.R., J.W., and C.E. and awarding custody of the children to the Roanoke City

Department of Social Services (RDSS).  On appeal, mother contends there was insufficient

evidence to terminate her parental rights pursuant to Code § 16.1-283(B).  Upon reviewing the

record and the briefs of the parties, we conclude that mother's appeal is without merit.  Accordingly,

we summarily affirm the decision of the trial court.  See Rule 5A:27.

                                       BACKGROUND

        On appeal, we view the evidence and all the reasonable inferences in the light most

favorable to appellee as the party prevailing below.  McGuire v. McGuire, 10 Va. App. 248, 250,

391 S.E.2d 344, 346 (1990).  So viewed, the evidence showed that on June 25, 2004, RDSS

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

removed eight-year-old C.R., four-year-old J.W., and twenty-two-month-old C.E. from the home belonging to mother and her husband, Ronnie Oliver, Jr. (father), and placed them in foster care.

Chad Alls, Child Protective Services supervisor for RDSS, visited the home on June 25, 2004 in reference to a complaint. The kitchen was "full of trash [and] old food," "you, basically could not see the floor," and "[r]oaches were everywhere." Alls found J.W. locked in a bedroom. He was naked and "filthy dirty." In his room, "[t]here was a mattress on the floor, clothes, food on the floor. There were feces and handprints smeared on the walls, the door." The window was broken and a "piece of board" covered it, and "there was feces on that." C.E. was in her crib in a room across the hall from J.W. "You basically, could not walk into that bedroom. There was so much clutter and trash and boxes. You could step into where the crib was and that was it." "[C.E.] was lying in a urine soaked crib that was slathered with feces as well."

RDSS prepared an initial foster care service plan on August 23, 2004, with a goal of returning the children to the home. RDSS directed the parents to attend parenting classes, receive counseling, and submit to psychological examinations. RDSS provided educational, psychological, and medical services to the children.

Foster Care Social Worker Peter Cardillo began working with the children on June 25, 2004. All the children had severe head lice, J.W. was grossly underweight, and C.R. had eating problems. J.W. and C.R. were "sexually acting out," and J.W. played with knives. C.E. had a six-word vocabulary and an ear infection. The parents attended and completed a parenting class but did not complete individual counseling. While working with the parents and children, RDSS learned that the children had more serious conditions and problems than originally believed.

Cardillo observed visits between the parents and children at RDSS and noticed the parents did not set boundaries for the children. Cardillo testified that mother and father were never able to assimilate the information from the classes and counseling or demonstrate they could address

and ameliorate the children's severe problems. During the eighteen-month period RDSS worked with mother, she repeatedly "expressed concern [about] why [she and father] were being referred to parenting classes." Cardillo opined that mother did not seem to understand why RDSS services were being provided. In July 2005, mother advised Cardillo that a doctor placed her on medication for hallucinations, but mother "stated she didn't think she needed to take them and didn't want to take them." Cardillo then asked mother for a release so he could speak with the doctor, but mother failed to comply.

In late summer of 2005, it became evident that the parents could not provide proper care for the children or a safe environment, so, on August 5, 2005, RDSS changed its initial goal from returning the children home to terminating the parents' parental rights pursuant to Code § 16.1-283(B) and (C)(2). Cardillo explained:

> Despite all the services that the agency has offered over the last eighteen months Mr. and Mrs. Oliver have not made any successful completions of any of these services. Even though they have attended they have not gained anything from them that would remotely allow the children to [safely] come home.

Because of the children's severe conditions, they were not able to function with each other, so it was recommended they be placed in separate environments. C.R. was placed at the Pines Residential Treatment Center (the Pines), and J.W. and C.E. were placed in therapeutic homes.

Debbie Stanley, a Child Protective Services worker, investigated allegations of sexual abuse committed by the parents against C.R. C.R. alleged the parents touched her private parts in the bathtub. The complaints were deemed founded Level One. Mother was convicted of three counts of felony child neglect.

Dr. Doris Nevin is a licensed clinical psychologist who prepared a psychological evaluation of mother in 2004. Dr. Nevin reported that mother married the children's father when she was fourteen years old and had her first child, C.R. shortly thereafter. Dr. Nevin found that mother "has

a significant, pervasive self-defeating behaviorial pattern, as well as symptoms of depression" and was functioning in the borderline range of intelligence. Mother's weak reading skills limited her ability to complete some of the tests, and mother repeatedly refused assistance when offered by Dr. Nevin. Dr. Nevin found mother to be highly dependent on others to meet her needs and opined that mother suffers from stress regarding her ability to meet her children's needs. Dr. Nevin noted the "possible presence of some transient psychotic issues" based on mother's report that she sometimes hears voices of deceased relatives. Dr. Nevin reported that mother is "defensive and mistrusts others," and she "is apprehensive and experiences a significant amount of tension." According to Dr. Nevin, mother "is experiencing symptoms of disturbed thinking that likely interferes with her ability to consistently respond in a rational manner." Dr. Nevin opined that those symptoms "would negatively impact [mother's] ability to parent young children due to her difficulties with following things in a rational manner and being able to respond to her environment" and the people in it. Referencing several parenting skills that mother lacked, Dr. Nevin felt that mother must demonstrate the "ability to recognize and meet her own needs and those of her children" before the children could return home. In summary, Dr. Nevin had "significant concerns regarding [mother's] intellectual limitations, her mental health needs, and her [lack of] basic knowledge of appropriate parenting skills."

Dr. Robert Luna, a psychiatrist, has treated C.R. at the Pines since July 2005. He testified that she suffers from Post Traumatic Stress Disorder (PTSD), Oppositional Defiant Disorder, and Attention Deficit Disorder (ADD). She takes Zoloft for depression and PTSD, Ritalin for ADD, and Resperdol for sleep disturbances and nightmares. Dr. Luna recalled that C.R. discussed physical abuse in her home, including "being thrown out by her father and being locked up and her dog being thrown out." Counselors and therapists have tried to address "what makes her so fearful

and depressed." Dr. Luna testified, "[W]e would like [C.R.] to be discharged to a supportive, nurturing, protective home," and continue with her therapy.

Dr. Robert Lanaham, a licensed clinical psychologist, evaluated J.W. and C.R. In a February 5, 2005 evaluation letter, Dr. Lanaham wrote that "[C.R.] and [J.W.] evidence significant developmental deficits across numerous continuums." C.R. showed "a disturbed capacity to handle stress," and evidences "an undercurrent of sexual inappropriateness which may or may not be due to sexual victimization" indicating she "has had exposure to sexual matters." When stressed and anxious, C.R. would pull her hair out and crawl under furniture. C.R. indicated she did not want to return home "unless they 'take care of the bugs.'" She reported "waking up with 'bugs all over me biting me' and needing her parents to spray her." Dr. Lanaham testified that C.R. suffers from "reactive attachment disorder of infancy, inhibited typed, fine motor coordination disorder, expressive language disorder, borderline intellectual functioning, anxiety disorder not otherwise specified, and features of hypersominia, restlessness and PTSD."

Dr. Lanaham diagnosed J.W. as having "reactive attachment disorder, inhibited type," Attention Deficit Hyperactive Disorder (ADHD), "daily and nighttime motor coordination disorder, fine and gross motor [and] language disorder, expressive and receptive." As a result of J.W.'s abuse and neglect, he has "numerous development delays that manifest themselves through speech and language deficits, motor impairment, attentional limitations, attachment issues and cognitive limitations." Moreover, he showed "an unusual preoccupation with sitting in his own bowel movements and is said to enjoy the feeling of being wet."

In his February 2005 report, Dr. Lanaham noted that the parents "have not demonstrated a capacity to adequately address" the children's special needs and recommended that J.W. and C.R. remain with the foster parents and treatment team "where the stability, safety and security that has

been established can continue to blossom." At the December 2005 trial, Dr. Lanaham testified that his earlier recommendation has not changed.

Mona Samms is an occupational therapist. She worked with J.W. from December 2004 until August 2005, and with C.R. from November 2004 until July 2005. J.W. had major delays in gross and fine motor coordination. For example, J.W. was clumsy, had poor trunk control, and would often crawl instead of walking.

Beth Webber, a day treatment worker, provided counseling services to J.W. and C.R. while they were in foster care. Webber observed visits between the children and the parents and noticed a lack of structure, chaos, and little, if any, discipline.

Melissa Hays-Smith is a licensed clinical social worker and play therapist. She saw C.R. for four individual interactive sessions until C.R. was taken out of her foster home and moved into residential placement. Hays-Smith noticed an immediate and significant amount of aggression in her play. Hays-Smith began seeing J.W. on June 16, 2005 for play therapy and sees him every other week. He generally plays the role of a father figure in a family and "in that role play he often is aggressive himself and abusive." She noticed the aggression in all but the initial session and opined "there are issues within that role play that need to be worked out and are difficult to work out." Hays-Smith recommended that J.W. "be in a place where he feels safe and secure. He needs to be in a place where all of his needs are being met, his basic needs are being met, or he can't really work on these [other] issues."

The parties stipulated that

> [J.W.] and [C.E.] are both placed in what we call therapeutic foster homes, which means the foster care parents received intensive training at the beginning, knowing that they were going to provide a therapeutic placement as opposed to just a traditional foster care placement. They are taught discipline techniques in terms of dealing with the behavior issues that these children have. They are responsible for getting the children to all the appointments.

> They have a lot of support as such, and the other part of that is that the therapeutic foster home who has [J.W.], although [it] is extremely committed to him, they are actually having to use Respite in order to make that placement work. His behaviors are such that they do have to employ Respite care for him occasionally . . . .

The parties also stipulated to results and findings by two professionals: Dr. Richard Claytor, a psychiatrist with Family Preservation, and Sharon Brammer, a licensed professional counselor. Dr. Claytor treated J.W. and C.R. He diagnosed J.W. with ADHD and noted a history of physical abuse. J.W. is currently taking Adderol and Tenex for his ADHD and Resperdol for "behavior issues and his sleep disorders." He diagnosed C.R. with ADHD and PTSD before she was sent to the Pines. She also had a history of physical abuse. Before C.R. was transferred to the Pines, "she was on Zoloft for depression and PTSD, [and] Resperdol for agitation and aggression, mostly aggression."

Brammer found that J.W. had attachment disorder, a condition that can occur during the first eighteen months of a child's life if attachments and bonding do not occur. According to Brammer, J.W. "is going to have behavioral, plus neurological deficits lifelong and they would all be due to the neglect he received or had during the first eighteen months of his life." It was Brammer's opinion that J.W. should remain in his current placement as he will manifest lifelong attachment disorder.

Brammer noted that C.E. also demonstrated avoidant attachment disorder; however, as the youngest child, her attachment disorder is not as severe as the older children. Brammer recommended play therapy for C.E. and opined that C.E. would benefit from remaining in her current placement. Brammer also opined that trauma results when children who have these attachment issues are reunited with their biological families.

At the conclusion of the presentation of evidence by RDSS, mother joined in father's motion to strike, arguing that she and father did all that was required and RDSS did not present

clear and convincing evidence to support termination. Mother further argued that RDSS was "required to exhaust all less restrictive goals before they can go to a goal of adoption." Continuing, mother argued if she and father are not ready to care for the children, the children should be placed with the children's maternal grandparents, the Gibsons.

The trial court denied the motion to strike. After presenting evidence, mother renewed her motion to strike with no additional argument.

Because mother complied with and completed RDSS's requirements that she complete a parenting class, attend counseling, and submit to testing, the trial court found that RDSS failed to present clear and convincing evidence to terminate mother's parental rights pursuant to Code § 16.1-283(C)(2). However, pursuant to Code § 16.1-283(B)(2), the trial court found clear and convincing evidence

> that the neglect or abuse suffered by each of these children presented serious and substantial threat to his or her life, health and development, and is not reasonably likely that the conditions that resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow safe return to [the mother] within a reasonable period of time.

The trial court based its decision on (i) the mother's "cognitive" and "parenting deficits," (ii) the unlikelihood that mother could safely care for the children in light of the conditions of the home and children when RDSS removed them and placed them in foster care, and (iii) the children's present mental and physical condition and needs.

The trial court entered the final order on February 21, 2006. Mother objected "on the grounds that the Department's evidence was insufficient to support termination of parental rights."

DISCUSSION

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests."

Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2 460, 463 (1991). Where the trial judge hears the evidence *ore tenus,* the judge's decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. See Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 282, 343 S.E.2d 70, 73 (1986).

In her brief, mother argues that we "cannot resolve [the trial court's] finding of dismissal on Section 16.1-283(c)(2) [sic] and his finding in favor of the Department on Section 16.1-283(B)." She asserts:

> Upon proof that the Department failed to meet its burden on Section 16.1-283(c)(2) [sic], the Department should not be allowed to fall back on 16.1-283(B). Especially when the case purported to support the Department's position can be distinguished from the case at bar.

Concluding, mother asserts, "In light of the differences between Toms [v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 616 S.E.2d 765 (2005),] and the case at bar, the remedial acts taken by [mother] and the fact that parents['] rights should not be severed lightly, the Department should not be allowed to obtain termination of parental rights pursuant to Section 16.1-283(B)."

"The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). See Rule 5A:18. Appellant did not make this argument to the trial court. Accordingly, Rule 5A:18 bars our consideration of this question on appeal.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).

As to the sufficiency of the evidence to support the trial court's decision to terminate mother's residual parental rights under Code § 16.1-283(B)(2), that decision was supported by the evidence and was not plainly wrong.

Code § 16.1-283(B) provides in pertinent part:

> The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1.  The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2.  It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.  In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

In Toms, we held that the provision of services, "while a relevant circumstance, cannot be viewed as a prerequisite to a . . . termination [under Code § 16.1-283(B)] – one, which if not met, would render termination legally invalid no matter the unique circumstances of the case." 46 Va. App. at 270, 616 S.E.2d at 771 (holding that "[t]he *prima facie* examples listed in Code § 16.1-283(B)(2)(a) to 16.1-283(B)(2)(c)" are not "the only conceivable methods of proof," but are "illustrative, not exhaustive").

Viewed in the light most favorable to RDSS, clear and convincing evidence proved that the children suffered abuse and neglect resulting in serious mental, emotional, and physical disabilities, Code § 16.1-283(B)(1), and "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the safe return to his parent or parents within a reasonable period of time," Code § 16.1-283(B)(2).  At the time of trial,

- 10 -

the children had been in foster care for eighteen months. The evidence demonstrated that because of the abuse and neglect suffered by them, the children manifested conditions needing long-term, continued, and specialized treatment. Expert witnesses opined that removing the children from trained foster parents and returning them to the parents would be detrimental to their health, safety, and recovery.

RDSS presented sufficient clear and convincing evidence to support the trial court's findings and rulings. Therefore, the evidentiary requirements of Code § 16.1-283(B)(2) were met, and the trial court's findings and judgment were not plainly wrong or without evidence to support them. Accordingly, we affirm the decision of the trial court.

Affirmed.