COURT OF APPEALS OF VIRGINIA


Present:    Judges McClanahan, Haley and Senior Judge Willis


WILLIAM ROSE

MEMORANDUM OPINION[*]

v.        Record No. 2335-08-3

PER CURIAM
JUNE 16, 2009

ROANOKE CITY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
William D. Broadhurst, Judge

(Patrick J. Kenney, on brief), for appellant.

(William M. Hackworth, City Attorney; Heather P. Ferguson,
Assistant City Attorney; Ronnie L. Clay, Guardian *ad litem* for the
minor children, on brief), for appellee.


William Rose (father) appeals the circuit court's ruling to terminate his parental rights to his

three children. Father contends that the trial court erred by finding the evidence sufficient to

terminate his parental rights. Upon reviewing the record and briefs of the parties, we conclude

that this appeal is without merit. Accordingly, we summarily affirm the decision of the trial

court. See Rule 5A:27.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence proved that in October 2004, a child protective services (CPS)

investigator responded to a complaint that the father's oldest child, H.G., who was approximately

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

five months old, was living in a home that was dirty, had roaches and rats, and was inappropriate for her. Father was living with the child's mother, Christy Gillespie, and his own mother, Michelle Finney, at the time.[1] The CPS investigator told the family to clean the house.

In January 2005, CPS investigated another complaint regarding the cleanliness of the house.[2] The house was messy and littered with cat and dog feces. The complaint was founded against Finney. The CPS investigator spoke with father about keeping the home clean.

In September 2005, CPS investigated a third complaint alleging a dirty house and that father's second child, D.G., who was less than one month old, had a piece of metal in her eye. The complaint was founded against Finney, and the investigator again spoke to father about keeping the home clean. The Department of Social Services (DSS) tried to provide homemaker and budgeting assistance for the household, but the family declined the services.

In March 2006, CPS investigated a fourth complaint alleging a dirty house. Ten people lived in the house. The bedroom occupied by father and mother was "especially bad." A litter box was overflowing. Cat feces were smeared on the floor and on the baby's swing. The bathrooms were filthy, and the downstairs bathroom did not work. The house was deemed unfit for human occupancy and was condemned. The complaint was founded against father and mother. DSS removed the children from the home. H.G. and D.G. were placed with a relative; however, a few days later, the relative said that she could not take care of the children. H.G. and D.G. were placed in foster care. When they entered foster care, H.G. and D.G. were behind in their immunizations, and H.G. had dental issues and cavities.

---

[1] Father was a minor child until February 2007.

[2] Father, mother, and Finney moved frequently. During the CPS investigations, from October 2004 until January 2008, they lived in at least five different homes.

DSS prepared a foster care plan and listed requirements for father, which included that he (1) enroll and attend the GED program; (2) obtain and maintain safe, clean, and stable housing; (3) cooperate with individual counseling and medication management; (4) cooperate with the rules of visitation; (5) participate in and complete parenting classes; (6) cooperate with homemaker services; and (7) cooperate with other services deemed appropriate by the agency.

In March 2007, CPS investigated another complaint of a dirty house. Father's third child, E.G., was approximately three months old. The foster care worker visited the home, found it to be dirty and cluttered, and discovered several safety concerns. The foster care worker explained to father what he needed to do to clean the home and eliminate the safety concerns. The safety concerns remained upon the foster care worker's follow-up visit.

In June 2007, father and mother moved. The foster care worker visited the house and found that the conditions of this house were worse than in the previous residence. She discussed her concerns with father, who made improvements.

In January 2008, DSS placed H.G. and D.G. with father and mother for a trial home placement. When DSS visited the home, the foster care worker found the house to be dirty and cluttered. DSS also discovered that there was no heat in the home. H.G. and D.G. returned to foster care. DSS removed E.G. and placed him in foster care too. The children were dirty, and E.G. had a blistered diaper rash and ear infection. CPS investigated the situation, and the complaint was founded for physical neglect against father and mother.

When E.G. entered foster care, he had significant developmental delays. He could not walk or talk. He expressed little to no emotion. Initially, Dr. Katheryn Kerkering, a developmental behavioral pediatrician, thought E.G. might be autistic or mentally retarded. After eight months in foster care and with intervention from specialists, he was only slightly behind developmentally. Autism and retardation were no longer considered as possible

diagnoses. Dr. Kerkering believed that E.G.'s problems arose from his home environment. Once removed from that environment and placed in a stimulating, stable, and nurturing environment, E.G. improved.

In August 2008, DSS visited father and mother's home again. Father tested positive for marijuana. The home was in disarray and filthy. The electricity had been turned off due to an outstanding bill. There were animal feces all over the home and roaches in the kitchen.

Throughout DSS's involvement in the situation, father never fully complied with DSS's requirements of him. He had three individual counselors and never followed through with their recommendations. He frequently missed appointments, and he did not comply with medication management. He was unable to show that he was financially able to provide for his children. He kept animals in the home, despite being told to not own any. He did not attend two recommended programs. He did, however, complete the parenting classes.

DSS provided homemaker services from November 2006 through March 2007 and from October 2007 through January 2008. The services were cancelled due to lack of progress and lack of cooperation. Although there was some improvement in late 2007, "everything started to revert back" once the children were placed in the home in January 2008.

DSS also provided referrals to the Roanoke Redevelopment and Housing Authority for low-income housing, referrals for heating assistance, and referrals for daycare assistance. DSS provided bedroom furniture for the family, insecticide and cleaning materials, food stamps, and Medicaid benefits.

After hearing the evidence and testimony, the circuit court found that the evidence was sufficient to terminate father's parental rights to H.G. and D.G. pursuant to Code § 16.1-283(C)(2), and to E.G. pursuant to Code § 16.1-283(B)[3] and 16.1-283(C)(2).[4]

## ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania County Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Father argues that the cleanliness of the home, which was the original reason for the children being removed from the home, was remedied. However, father admits that "there was

---

[3] Code § 16.1-283(B) states a parent's parental rights may be terminated if:

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

[4] Code § 16.1-283(C)(2) states a person's parental rights may be terminated if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

some back sliding." Father testified, "We did slack a little bit. . . . I guess we was all excited that the kids might be getting placed back home, and we couldn't, you know, we just got excited."

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

DSS had been involved with this family since 2004. There were repeated complaints of a dirty house, and DSS intervened. In fact, when H.G. and D.G. were removed from the home in 2006, the home was so filthy it was deemed unfit for human occupancy and was condemned. Thereafter, DSS provided numerous services to father, including homemaker services. In 2007, it appeared that father was making progress, and in January 2008, the children were returned home for a trial run. Finding no heat and a dirty house, DSS removed the children and placed them back in foster care. E.G. was found to have substantial developmental delays due to the poor home environment. In August 2008, the house was still in disarray and dirty.

Despite all of the services and interventions, father was unable to maintain a clean house and safe environment for the children. Even the trial court stated, "I have never seen [a case] of a persistent failure of housekeeping to the level that it threatens health as I have seen in this case. . . . This is just a disaster." The trial court acknowledged that,

> as long as the homemaker was in the home telling them what to pick up and what to clean up, they . . . would be compliant, but once that person who was taking responsibility for their cleanliness and health status of the home was out of the picture, they reverted, and . . . [it] is likely, that condition they were living in and what they are used to is what they think they are entitled to live in, and

- 6 -

they shouldn't have to do more. . . . There is simply no likelihood in this Court's view, based on th[e] evidence, that try as they might or not, that Ms. Gillespie and Mr. Rose will be able to remedy these conditions in any reasonable period of time in the future.

Father further argues that he was not responsible for the lack of cleanliness in the home. However, the trial court found that father's testimony was "absolutely incredible and unacceptable." "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997) (*en banc*).

The trial court terminated father's parental rights to all three children pursuant to Code § 16.1-283(C)(2), but it also terminated father's parental rights to E.G. pursuant to Code § 16.1-283(B). The trial court found that father's parental rights to E.G. could be terminated pursuant to either statute.

E.G. had profound developmental delays when he was removed from father's care. The trial court found that the neglect or abuse suffered by E.G. "presented a serious and substantial threat to his life, health and development." Dr. Kerkering testified that E.G. would not smile, interact, or play. Upon her initial assessment, Dr. Kerkering considered possible diagnoses of autism or mental retardation. However, E.G.'s problems were related to his home environment, and, after time with his foster family, he improved dramatically.

"[S]ubsection B [of Code § 16.1-283] 'speaks prospectively' and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to substantially remedy the underlying problems." Toms, 46 Va. App. at 270-71, 616 S.E.2d at 772 (quoting Winslow, 40 Va. App. at 562-63, 580 S.E.2d at 466).

Father failed to follow through on many of DSS's requirements, including counseling, medication management, and obtaining his GED. Father could not maintain a clean, safe, and

- 7 -

healthy home for his children.  The trial court found that father would not be able to remedy the conditions in the near future.

## CONCLUSION

The record supports the trial court's finding that the evidence proved by clear and convincing evidence that father's parental rights to his children should be terminated and that the termination of father's parental rights was in the children's best interests.  Code § 16.1-283(B) and 16.1-283(C)(2).  Accordingly, we summarily affirm the judgment.  <u>See</u> Rule 5A:27.

<u>Affirmed.</u>