COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Kelsey and Senior Judge Overton
Argued at Richmond, Virginia


GRANVILLE FRAZIER TOMS, III

OPINION BY
v.       Record No. 1869-04-2          JUDGE D. ARTHUR KELSEY
AUGUST 9, 2005
HANOVER DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF HANOVER COUNTY
John Richard Alderman, Judge

Corinna Barrett Lain (Frank G. Uvanni, Guardian *ad litem* for
Granville Frazier Toms, III; University of Richmond Law
School; Uvanni & Associates, PC, on briefs), for appellant.

Dennis A. Walter, Assistant County Attorney; R. Craig Evans,
Guardian *ad litem* for the minor children (Sterling E. Rives, III,
County Attorney; McCaul, Martin, Evans & Cook, on brief), for
appellee.


Granville Frazier Toms, III, appeals a decision of the circuit court terminating his

residual parental rights pursuant to Code § 16.1-283(B) and approving a goal of adoption for six

of his children.  The circuit court erred, Toms argues, for three reasons.

First, Toms contends the evidence is insufficient to justify termination of his parental

rights.  Second, even if the evidence were sufficient, Toms claims the circuit court erred as a

matter of law by ordering termination under Code § 16.1-283(B) without first confirming that he

received adequate rehabilitative services while his children were in foster care.  Third, Toms

contends due process principles impose upon the state in all parental termination cases the duty

to provide rehabilitative services to the parent.

Finding none of these arguments persuasive, we affirm.

I.

We view the evidence in the "light most favorable" to the prevailing party in the circuit court and grant to that party the benefit of "all reasonable inferences fairly deducible therefrom." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

Frazier and Laura Toms are the biological parents of eight children — seven boys and one girl. On January 28, 2003, Laura Toms left the family home and walked to a neighbor's house. Her husband was holding her against her will, she told the neighbor, and had abused her. The children were home alone. When the sheriff's office responded to the Toms house, two deputies met one of the boys standing at the gate to the property. The boy told the deputies to leave and that his father was not at home. Concerned about the safety of the children, the deputies entered the property several minutes later. The boy ran into the woods. When the deputies walked into the house, they noticed a two-year-old boy standing on a bed. The rest of the children could not be found. They too had fled into the woods.

What appeared to be the Toms residence was a 16' by 16' unfinished structure. The structure had three stories, but no access between the floors. The family lived together on the first floor. The house had no electricity or indoor plumbing. There were no rooms, no indoor sinks or bathtubs, and no kitchen. The structure was "full of trash." The family used an outdoor tub for bathing and a primitive outdoor latrine. The yard around the structure was littered with alcohol bottles and cans.

About thirty minutes after the deputies arrived, Fraizer Toms appeared at the house. He was visibly intoxicated and agitated. The deputies sought his assistance in finding the children, but he refused to cooperate and was eventually arrested. A K-9 unit and multiple aircraft assisted in the search for the children. It was near freezing temperatures, and the children had no

coats, hats, or gloves to protect them against the cold. About eight hours later, at around 3:30 a.m., the children emerged from the woods. The rescue unit took the children to the hospital for examination for potential hypothermia.

Laura Toms was hospitalized that same evening due to a psychiatric condition. The children were placed in a foster home by Hanover Department of Social Services (HDSS) the next day, and petitions were submitted seeking emergency removal orders for the children. The Hanover Juvenile and Domestic Relations District Court approved the removal, holding that the children were abused or neglected by their parents. The JDR district court also approved foster care plans for the children presented by HDSS and allowed HDSS to perform additional evaluations and assessments to determine the appropriate goal.

In October 2003, the JDR district court approved HDSS's goal of adoption for the children and, in February 2004, ordered that Frazier and Laura Toms's residual parental rights be terminated.[1] Both appealed these decisions to the circuit court.

At the circuit court hearing, the children's psychologists testified to the profound neglect evidenced by the children's underdeveloped speech, intelligence, motor skills, and social and emotional functioning. The children scored below the first percentile on standardized child developmental tests. The children had "received no health care, no education, no social skills, no speech skills." The Toms residence "was so pathetically substandard that it itself demonstrates abuse and neglect." The guardian *ad litem* for the children reported to the circuit court that, during his first meeting with the children, their "speech was almost wholly unintelligible, consisting of 'grunts' and various forms of body language."

---

[1] HDSS sought the termination of the Toms's parental rights with respect to six of their eight children — the oldest son reached the age of majority, and both Frazier and Laura Toms voluntarily terminated their parental rights to their infant son.

Psychological testing revealed that Frazier Toms suffered from episodes of delusional thinking, social phobias, paranoia, obsessive-compulsive disorder, depression, severe anxiety, and avoidant personality features. The extent of his mental illness led one psychologist to conclude that his prognosis for rehabilitation was poor. At one point in the evaluation process, Frazier's mother reported that her son had been diagnosed as a teenager with paranoid schizophrenia and was hospitalized for that condition. Commenting on this report, the psychologist who prepared a parenting assessment of Toms noted: "Signs of his paranoia were clearly evident during this assessment process." The parenting assessment concluded that the "children would be at serious risk if returned to Mr. Toms at this time or in the near future."

The evidence also showed that Toms started drinking alcohol at age six. In 1995, Toms had his driving privileges suspended after a DUI conviction. By 1998, he was consuming up to six beers and a pint of alcohol on a daily basis. He typically passed out at least twice a week from intoxication. Toms's counsel admitted to the circuit court that Toms "began to seriously abuse alcohol, which, of course, made everything worse." His counsel further acknowledged that "this family lived in nothing short of absolute crisis conditions for three years before Hanover police, and finally DSS, intervened in January 2003."

At the circuit court hearing, Toms's counsel conceded that HDSS proved — as required by Code § 16.1-283(B)(1) — that Toms's neglect or abuse of his children "presented a serious and substantial threat" to their lives, health, or development. Toms argued, however, that HDSS failed to prove — as required by Code § 16.1-283(B)(2) — that it was "not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child[ren's] safe return to [their] parent or parents within a reasonable period of time."

Agreeing with the judgment of the JDR district court, the circuit court approved the goal of adoption and ordered that Toms's parental rights be terminated under Code § 16.1-283(B). "Given the abuse and neglect heaped upon [the Toms children] that has so profoundly affected them," the circuit court concluded, "it is without a doubt that it is in their best interest."[2]

In a related criminal proceeding, the circuit court convicted Toms of seven misdemeanors and two felonies for the abuse and neglect of his children. He remains incarcerated at this time on those convictions.

## II.

Toms appeals the circuit court's decision to terminate his parental rights.[3] On appeal, Toms claims the circuit court erred because (A) insufficient evidence supports the decision to terminate, (B) HDSS violated a statutory duty to provide him with rehabilitative services, and (C) constitutional due process principles independently require rehabilitative services prior to termination.

### A. SUFFICIENCY OF THE EVIDENCE

When reviewing a decision to terminate parental rights, we presume the circuit court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326,

---

[2] The circuit court also terminated the residual parental rights of Laura Toms, a decision she did not appeal. Throughout this opinion, "Toms" will refer only to Granville Frazier Toms, III, unless the context suggests otherwise.

[3] Toms also challenges the circuit court's companion order approving the HDSS foster care plan's goal of adoption. Our decision to affirm the termination order necessarily subsumes this aspect of his appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans. See Richmond Dep't of Soc. Servs. v. Carter, 28 Va. App. 494, 497, 507 S.E.2d 87, 88 (1998); Padilla v. Norfolk Div. of Soc. Servs., 22 Va. App. 643, 645, 472 S.E.2d 648, 649 (1996).

329, 387 S.E.2d 794, 796 (1990)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted)). In its capacity as factfinder, therefore, the circuit court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795.

The circuit court in this case terminated Toms's parental rights under Code § 16.1-283(B). Under that subsection, residual parental rights may be terminated if clear and convincing evidence demonstrates that it is in the children's best interests, that the neglect and abuse suffered by the children presents a serious and substantial threat to their life, health, or development (subsection B(1)), and that it is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the children's safe return to their parent within a reasonable period of time (subsection B(2)). See generally City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 561-62, 580 S.E.2d 463, 465-66 (2003).

Because "the rights of parents may not be lightly severed," M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 187, 583 S.E.2d 761, 769 (2003) (citation omitted), clear and convincing evidence must establish the statutory grounds for termination. Fields, 46 Va. App. at 7, 614 S.E.2d at 659. In the end, the "child's best interests" remain the "paramount consideration" of the court. Akers v. Fauquier County Dep't of Soc. Servs., 44 Va. App. 247, 262, 604 S.E.2d 737, 744 (2004) (citation omitted). Even on this issue, however, we cannot "substitute our judgment" for the circuit court's, Ward v. Commonwealth, 13 Va. App. 144, 148, 408 S.E.2d 921, 923 (1991), but rather review the record only to determine if sufficient evidence supports it.

In this case, the factual record supports the circuit court's decision to terminate Toms's parental rights under Code § 16.1-283(B). After the lengthy hearing, the trial court found the evidence was "overwhelming that the Toms children have experienced abuse or neglect that has demonstrably had a serious and substantial detrimental effect on their lives, health and development." Especially in regards to the older children, the court was "utterly convinced" that their "health and development has been harmed to such an extent that it may well be permanent." "Given the abuse and neglect heaped upon them that has so profoundly affected them, it is without a doubt that it is in their best interests." These conclusions are fully justified based upon the evidence before the circuit court and the concessions of Toms's counsel on this subject.

We also hold that the record supports the circuit court's finding that Toms could not, within a reasonable period of time, substantially remedy the conditions that resulted in the children going into foster care. See Code § 16.1-283(B)(2). Toms's life has been badly scarred by destructive patterns of alcohol abuse and debilitating bouts of mental illness. These longstanding conditions go back to his childhood and cannot be explained away as recent, readily correctable, maladies. And they were severe enough to cause Toms to cloister his children in inhumane living conditions, to deprive them of routine medical care, and to do nothing to stop the steep regression in their developmental skills.

Toms complains that the circuit court did not give him a "fair chance" because it appeared to gauge the probability of his future reformation by examining the severity of his past actions. We fail to see, however, how the circuit court's reasoning can be characterized as unfair. To be sure, Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'"

Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms had the opportunity to explain his past actions and to offer promises of future self-reformation. The circuit court, however, rejected his testimony. "Suffice it to say," the trial judge found, he "was not convinced of either Mr. Toms's sincerity or dedication to remedying what are obvious functional disabilities." "His testimony was vague and nonspecific," the judge added, "and particularly revealed that he had taken virtually no steps since January 2003 to remedy anything (recognizing that he was in jail for some period of time)."

Given the evidence in this case, the circuit court had sufficient factual grounds to support its decision that Toms could not, within a reasonable period of time, substantially remedy the conditions that resulted in the children going into foster care. See Code § 16.1-283(B)(2).

### B. CODE § 16.1-283(B) & REHABILITATIVE SERVICES

Whatever permissible inferences flow from his past actions, Toms argues, the circuit court still erred as a matter of law in granting the petition for termination because HDSS failed to provide him with rehabilitation services required by Code § 16.1-283(B). Toms concedes the text of subsection B does not literally impose such a requirement. But the "larger statutory scheme" does, he contends. We disagree. Code § 16.1-283(B) requires only that the circuit court consider whether rehabilitation services, if any, have been provided to a parent. Nothing in Code § 16.1-283 or the larger statutory scheme requires that such services be provided in all cases as a prerequisite to termination under subsection B.

(i) *The Difference Between Code § 16.1-283(B) & (C)*

Code §§ 16.1-283(B) and 16.1-283(C)(2) both "set forth individual bases upon which a petitioner may seek to terminate residual parental rights." Winslow, 40 Va. App. at 563, 580 S.E.2d at 466. Though we have sometimes blurred the distinctions between the discrete subsections of Code § 16.1-283, see, e.g., Norfolk Div. of Soc. Servs. v. Hardy, 42 Va. App. 546, 552-53, 593 S.E.2d 528, 531 (2004), on this one issue a significant dissimilarity exists.

Subsection C(2) specifically requires a showing that DSS has provided "reasonable and appropriate" services to a delinquent parent prior to terminating his rights. In this way, the statute establishes a time frame after the child has entered foster care for the parents "to receive rehabilitative services to enable them to correct the conditions that led to foster care placement." L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 57, 581 S.E.2d 886, 889 (2003); see also Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243, 288 S.E.2d 410, 415 (1982).

Subsection B(2), on the other hand, merely requires the court to "*take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.*" (Emphasis added.) Added to the statute in 1998, see 1998 Va. Acts, ch. 550, this provision swept aside earlier *dicta* in our caselaw implying that, under subsection B, only rehabilitation services provided by DSS after the child's removal could be considered. See Banes v. Pulaski Dep't of Soc. Servs., 1 Va. App. 463, 466, 339 S.E.2d 902, 904 (1986) (apparently recognizing only the rehabilitation efforts "taken by social agencies"). Subsection B does not create specific time frames, "nor does it mandate that a public or private agency provide any services to a parent after the child enters foster care." Kate D. O'Leary, Termination of Parental Rights in Virginia, 17 J. Civ. Litig. 17 (2005).

That is not to say that a trial court considering a subsection B termination case should ignore a parent's inexcusable failure to respond to rehabilitative services offered by DSS or other assisting agencies after the child's removal. Subsection B(2)(c) specifically recognizes this circumstance as a *prima facie* ground justifying termination. See, e.g., Logan, 13 Va. App. at 128-29, 409 S.E.2d at 463; Banes, 1 Va. App. at 466, 339 S.E.2d at 904. But it is to say that the provision of such services, while a relevant circumstance, cannot be viewed as a prerequisite to a subsection B termination — one, which if not met, would render termination legally invalid no matter the unique circumstances of the case. The *prima facie* examples listed in Code § 16.1-283(B)(2)(a) to (B)(2)(c) do not purport to be the only conceivable methods of proof. The list is illustrative, not exhaustive.

Put another way, even though subsection B identifies a parent's failure to respond to rehabilitative services (implying that some were in fact offered by "rehabilitative agencies") as "*prima facie* evidence that it is not reasonably likely that the child can be returned to the parent in a reasonable period of time, the statute does not condition such a finding upon this evidence alone." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 539, 394 S.E.2d 492, 494 (1990) (rejecting a parent's claim that DSS "failed to sustain its burden" under subsection B because DSS "provided no proof that he was ever offered, or ever participated in, any rehabilitative services").[4]

Viewed in context, subsection B "speaks prospectively" and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to

---

[4] Subsection B, after all, also lists another example of *prima facie* evidence (severe "mental or emotional illness") that makes no mention of a parent's failure to respond to any rehabilitative services. Because one of the examples of a *prima facie* case expressly outlined in § 16.1-283(B) includes no mention of rehabilitative services, it cannot be reasonably asserted that the subsection necessarily requires them in all cases.

substantially remedy the underlying problems.  Winslow, 40 Va. App. at 562-63, 580 S.E.2d at 466.[5]  In contrast, subsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes.  Considerably more "retrospective in nature," id., subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.[6]

This dissimilarity stems from the differing precipitating events leading to the need to remove the child from the home in the first place.  The precipitating event of subsection B is a judicial finding of neglect or abuse.  Subsection C termination cases, however, start off with no such finding of parental culpability.  Subsection B, unlike C, often addresses situations farther along the continuum toward termination — thus making the continued provision of rehabilitative services a relevant concern, but not an absolute prerequisite to termination.  See Kaywood, 10 Va. App. at 539, 394 S.E.2d at 494; see also David J. Herring, Inclusion of the Reasonable Efforts Requirement in Termination of Parental Rights Statutes:  Punishing the Child for the Failures of the State Child Welfare System, 54 U. Pitt. L. Rev. 139, 174-77 (1992) (surveying state statutes that treat rehabilitative services as a "relevant" factor, but not a "condition precedent").

---

[5] Cf. Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243, 288 S.E.2d 410, 415 (1982) (holding that, in a subsection C case where "there is undisputed evidence that a parent has not been offered or provided services, the prima facie case is overcome").

[6] Toms cites Cain v. Commonwealth, 12 Va. App. 42, 402 S.E.2d 682 (1991), for the proposition that Code § 16.1-283(B) requires that rehabilitative services must be provided in every case prior to termination.  Cain does speak to the issue of rehabilitative services, but only in the context of a termination under Code § 16.1-283(C).  Id. at 45, 402 S.E.2d at 684.  This limited context was confirmed by Cain's reliance on Harris, 223 Va. at 243-44, 288 S.E.2d at 415, also a subsection C termination case.

(ii) *The Larger Statutory Scheme*

Toms argues that any judicial construction of subsection B should be tested against the context of the larger statutory scheme. We certainly agree.[7] But doing so does not lead us to the conclusion Toms asks us to draw.

Toms points us to Code § 16.1-281, the statute requiring DSS to prepare a foster care plan and submit it to the court for approval. In 1998, the General Assembly amended Code § 16.1-281. Prior to that amendment, the statute required that the initial foster care plan "shall be designed to lead to the return of the child to his parents or other prior custodian within the shortest practicable time which shall be specified in the plan." Former Code § 16.1-281(B). The 1998 amendment rewrote that sentence this way: "*If consistent with the child's health and safety*, the plan shall be designed to *support reasonable efforts which* lead to the return of the child to his parents . . . ." 1998 Va. Acts, ch. 550 (italicized language added by the amendment) (codified at Code § 16.1-281(B)). The amendment, therefore, gave DSS the initial discretion to abstain from reunification efforts if it deems them inconsistent with the "health and safety" of the child. Id. DSS also acquired the latitude to determine what efforts, if any, would be "reasonable" under the circumstances. Id.[8]

---

[7] Statutory provisions "which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." Finnerty v. Thornton Hall, Inc., 42 Va. App. 628, 635-36, 593 S.E.2d 568, 572 (2004) (citation omitted). As a result, we consider "the entire body of legislation and the statutory scheme to determine the 'true intention of each part.'" Id. at 636, 593 S.E.2d at 572 (citation omitted). And "when a controversy involves a number of related statutes," we construe them "together in order to give full meaning, force, and effect to each." Id.

[8] The General Assembly enacted the 1998 amendments to accommodate changes in federal grant requirements imposed by the Adoption and Safe Families Act (ASFA) passed by Congress in 1997 and codified in relevant part at 42 U.S.C. § 671. ASFA superseded the much criticized Adoption Assistance and Child Welfare Act of 1980 (AACWA), which had the unintended effect of encouraging the use of state termination statutes to "trap children in temporary foster care placements." David J. Herring, Inclusion of the Reasonable Efforts Requirement in Termination of Parental Rights Statutes: Punishing the Child for the Failures of

In addition, the 1998 amendment added a separate paragraph at the end of Code § 16.1-281(B). This provision precludes any court from overruling a DSS decision to forgo reunification efforts in certain egregious circumstances — like when a parent has been through prior involuntary terminations, or has been convicted of certain violent felonies, or has been found guilty of felony sexual assault. See 1998 Va. Acts, ch. 550 (amending Code § 16.1-281(B)). Outside these specific circumstances, however, the court retains it discretionary power to order rehabilitative services in aid of reunification despite DSS's initial decision that such efforts would be inconsistent with the child's health and safety.

In short, Code § 16.1-281(B) now renders DSS's duty to provide rehabilitation services contingent upon its belief that the reunification goal would be "consistent with the child's health and safety." The new paragraph added to the end of Code § 16.1-281(B) goes no further. It addresses not DSS's discretion — but the reviewing court's oversight power. The 1998 amendments to § 16.1-281(B) limit the authority of the court to reverse a DSS decision to withhold rehabilitative services in cases involving egregious circumstances. But nothing in the post-1998 version of Code § 16.1-281 requires that DSS in every case, as an indispensable precondition to later seeking termination, provide rehabilitative services in aid of reunification.

In this case, HDSS in fact included in the initial foster care plan a summary of anticipated rehabilitative services in aid of reunification.[9] As various psychological reports and parenting

---

the State Child Welfare System, 54 U. Pitt. L. Rev. 139, 157 (1992). To remedy this problem, ASFA recognizes the "health and safety of the child" as the paramount public policy concern, see 42 U.S.C. § 671(a)(15)(A) & (a)(15)(C), and allows states flexibility in determining whether reunification efforts serve that goal. See Kathleen S. Bean, Reasonable Efforts: What State Courts Think, 36 U. Tol. L. Rev. 321, 327 (2005) (observing that, under ASFA, "reasonable efforts at reunification are not required" in every termination case).

[9] In each initial Foster Care Service Plan, HDSS was "unable to determine" whether reunification was in the "best interest of this child," but planned to

assessments came in, however, HDSS concluded that reunification was inconsistent with the children's "health and safety" — a judgment call entrusted to HDSS by Code § 16.1-281(B). By approving the foster care plan recommending adoption and by granting HDSS's petition to terminate Toms's parental rights, the circuit court concurred with HDSS's assessment. Because we hold the evidence supports the circuit court's decision, HDSS's failure to provide rehabilitation services in aid of reunification cannot be a viable ground for reversal.

### C. DUE PROCESS & REHABILITATIVE SERVICES

Finally, Toms claims that the circuit court violated his due process rights by terminating his parental rights without first ensuring that he had received rehabilitative services. We again disagree. Due process requires that "fundamentally fair procedures" be employed in parental termination cases. Santosky v. Kramer, 455 U.S. 745, 754 (1982). This requires the state to demonstrate the statutory grounds for termination by clear and convincing evidence. Id. at 769 (agreeing with the majority of states that have concluded a "clear and convincing" standard of proof "strikes a fair balance between the rights of the natural parents and the State's legitimate concerns").

---

> evaluate Mr. and Mrs. Toms' need for services based on information gathered . . . from [1] their mental health evaluations and evaluators, [2] recommendations from the mental health evaluation and evaluators for child, [3] professionals currently providing services to Mr. and Mrs. Toms and [4] other involved parties.

HDSS also committed to "diligently work to thoroughly assess" all treatment recommendations to determine whether "Return Home to Parents" was a viable goal. Subsequently, Toms was compelled by a JDR district court order to complete a mental health assessment (to which he objected) and a substance abuse evaluation (which he refused to complete until a motion to show cause on his failure to do so had been filed). The social worker referred Toms to the Hanover Community Services Board to obtain substance abuse treatment (which he refused to do), gave him information about parenting classes (which he never attended), and arranged with Central Virginia Counseling Group for his parenting assessment. Given our holding, we do not address HDSS's alternative argument that sufficient rehabilitative services were in fact offered, but unreasonably refused, by Toms.

- 14 -

So, when the termination statute requires — as Code § 16.1-283(C) does — a showing "that 'reasonable and appropriate efforts' were made by social agencies to remedy the conditions leading to foster care," Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 829-30, 433 S.E.2d 500, 505 (1993), due process requires that this fact be proved by clear and convincing evidence, id. (citing Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 928, 265 S.E.2d 692, 696 (1980) (reviewing a termination decision under Code § 16.1-283(C))).

No judicial precedent has imposed a *constitutional* duty to provide rehabilitative services prior to termination when the statutory grounds for termination do not otherwise require them. And we know of no principled basis for asserting there to be one. We thus agree that "proof of past reasonable efforts" cannot be elevated into a constitutional mandate. David J. Herring, *supra*, at 168. "All that the Constitution requires under the majority opinion in Santosky is for the state to establish by clear and convincing evidence that the parent is currently unfit to provide proper care and custody for the child as defined by state [parental termination] statutes." Id.

### III.

Because sufficient evidence supports the circuit court's factual findings and no error of law undermines its judgment, we affirm the circuit court's decision to terminate Toms's residual parental rights under Code § 16.1-283(B).

Affirmed.