COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Kelsey, Beales and Senior Judge Clements


KRISTOFFER MICHAEL MASCH

                                                          MEMORANDUM OPINION*
v.     Record No. 0222-13-3                                     PER CURIAM
                                                               JULY 23, 2013
ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


              FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                           Charles N. Dorsey, Judge

          (Onzlee Ware, on brief), for appellant.  Appellant submitting on
          brief.

          (Daniel J. Callaghan, Acting City Attorney; Heather P. Ferguson,
          Assistant City Attorney; Diana M. Perkinson, Guardian *ad litem* for
          the minor children, on brief), for appellee.  Appellee and Guardian
          *ad litem* submitting on brief.


       Kristoffer Michael Masch (father) appeals an order terminating his parental rights to his

children, J. and S.[1]  Father argues that the trial court erred by finding that there was sufficient

evidence to terminate his parental rights pursuant to Code § 16.1-283(B) and -283(C)(2).  Upon

reviewing the record and briefs of the parties, we conclude that the trial court did not err.

Accordingly, we affirm the decision of the trial court.

                                       BACKGROUND

       We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax Cnty. Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

_____

       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

       [1] Since the children are minors, we will refer to them by their initials.

Father and mother are the parents of J., who was born in December 2010.  When J. was born, the parents were homeless, living in the Rescue Mission.  In January 2011, the Department of Social Services (the Department) initially became involved with the Masch family when it received a complaint that father had slapped his son, who was eight days old, and told him to "shut up."  In April 2011, the Department received a second complaint because J. had been admitted to the hospital as non-organic failure to thrive.  He weighed eight pounds, twelve ounces.  The hospital had numerous concerns about the parents' understanding of J.'s needs.  Neither father nor mother understood that the child had to eat every three hours, and they would delay his feedings.  They would ignore the child's cries for food and instead offer a pacifier.  The parents also placed stuffed animals in the crib and a blanket covering the child's face, despite being told not to do so.

While the child was in the hospital, father threatened, "I will slit nurses [sic] throats if my baby gets taken."  Father was carrying a pocketknife, which was confiscated.

The Department founded a complaint against the parents for physical neglect, inadequate food.  The Department also filed a petition to remove the child.  The Roanoke City Juvenile and Domestic Relations District Court (the JDR court) entered a preliminary removal order on April 18, 2011, granting temporary physical custody of the child to the Department.

The Department filed an initial foster care service plan and recommended numerous services for the parents.  The parents separated in July 2011.  Father lived in and out of the Rescue Mission and with friends before he and his mother started living in a two-bedroom apartment as of October 31, 2011.  Due to problems with the neighbors, he and his mother moved in February 2012.  Father completed his psychological evaluation, domestic violence assessment, and mental health assessment.

The psychologist evaluated father and diagnosed him with Adjustment Disorder with mixed anxiety and depressed mood, acute, R/O Major Depression, R/O Generalized Anxiety Disorder, and Dependent Personality Disorder with borderline features.

On June 30, 2011, father was involuntarily hospitalized for threatening to kill himself, his wife, his wife's mental health worker, a social worker, and the judge presiding over the case. Upon his release, father was referred to counseling, but did not appear for his assessments. He was arrested shortly thereafter for violating a protective order against his wife. He was incarcerated for more than a month. Father continued to miss his counseling appointments after his release. He also was not compliant with his medication.

On August 2, 2011, father was scheduled for a domestic violence assessment. He became upset, threatened to kill himself, and hid in the restroom. The Chief of Services talked father out of the restroom, and father completed his domestic violence assessment. After three sessions at the Domestic Violence Alternative Program, father stopped going to the classes because the counselor confronted him about his use of abusive language.

Initially, the parents visited with the child for two hours, two days per week. However, after the parents separated and based on the gastroenterologist's recommendation, the visits were reduced. Father visited with the child once per week, for one hour. The child would become irritable, clingy, and difficult to feed after visits. During the visits, the child would scream, cry, and hold his breath. Father would get frustrated and leave the visitation early. The reunification services were discontinued in January 2012 because of father's lack of progress.

Father did not complete his parenting classes and did not take advantage of other services offered by the Department, including GED classes and case management services at Blue Ridge Behavioral Healthcare. Father was eligible for services through the Veterans Administration, but

was not compliant with these services. In 2011, father was referred to weekly dialectical behavior therapy (DBT). From September 2011 until December 2012, father attended six sessions of DBT.

In March 2012, mother gave birth to S. Father denied that he was the biological father and refused to visit with S. until he received the results of the paternity test. The test ultimately revealed that father was the biological father of S. The Department obtained custody of S. shortly after he was born and placed S. in foster care.[2]

In August 2012, the Department filed a petition to terminate father's parental rights to J. and S.[3] On August 28, 2012, the JDR court terminated father's parental rights to J. pursuant to Code § 16.1-283(B) and -283(C)(2). The JDR court also terminated father's parental rights to S. pursuant to Code § 16.1-283(C)(2). Father appealed to the circuit court.

On December 12, 2012, the trial court heard testimony and argument regarding the termination of father's parental rights. On January 3, 2013, the trial court entered an order finding that it was in the best interests of J. and S. to terminate father's parental rights. The trial court terminated father's parental rights to J. pursuant to Code § 16.1-283(B) and -283(C)(2) and to S. pursuant to Code § 16.1-283(C)(2). The trial court approved the foster care plans with the goal of adoption for J. and S. This appeal followed.

## ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16

---

[2] Mother fled to Florida, where her parents live, a few days before S.'s birth. She did so in order to prevent the Department from taking custody of S. The Department informed the State of Florida about its concerns regarding mother and her parents. The State of Florida found that it was in S.'s best interests to send him to Virginia and relinquished jurisdiction over S.

[3] The Department also asked the JDR court to ratify the entrustment agreements entered into between mother and the Department regarding J. and S.

(1986) (citations omitted).  When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests."  <u>Logan</u>, 13 Va. App. at 128, 409 S.E.2d at 463.

*Termination of parental rights pursuant to Code § 16.1-283(B)*

Father argues that the trial court erred in finding that there was sufficient evidence to terminate his parental rights to J. pursuant to Code § 16.1-283(B).

Code § 16.1-283(B) states a parent's parental rights may be terminated if:

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.  In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

When J. was approximately four months old, he was hospitalized for non-organic failure to thrive.  J. was losing weight and not eating.  Despite efforts from the nurses and doctors, father failed to feed J. correctly and ignored the signs when J. was hungry.  While J. was in the hospital, father threatened the staff and had a pocketknife confiscated.

Once J. was in foster care, the Department offered numerous services to father; however, he failed to complete most of the requirements established by the Department to return J. home.  Father did not complete the required counseling and classes.  During visitations with J., he still could not feed J. properly and frequently became frustrated.  Father would terminate visits early, instead of learning to provide and care for J.  Father was diagnosed with mental health issues involving depression and anxiety.  He was involuntarily hospitalized for these issues.  Although father attended some counseling sessions, he never completed them.

"[S]ubsection B [of Code § 16.1-283] 'speaks prospectively' and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to substantially remedy the underlying problems." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 270-71, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Father did not remedy the underlying problems as related to J. He did not demonstrate an ability to care for J. and never completed the counseling requirements. The trial court did not err in terminating father's parental rights to J. pursuant to Code § 16.1-283(B).

*Termination of parental rights pursuant to Code § 16.1-283(C)(2)*

Father argues that the trial court erred in terminating his parental rights to J. and S. pursuant to Code § 16.1-283(C)(2).

A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Code § 16.1-283(C)(2).

As described above, father failed to complete the requirements necessary to have J. and S. return home. Father did not complete individual counseling. He did not complete the

- 6 -

domestic violence classes or the parenting classes. He declined services at Blue Ridge

Behavioral Healthcare and the Veterans Administration. He declined the Department's offer to

pay for GED classes. The reunification services were terminated due to father's lack of progress.

His visitations with J. often ended early because father would become frustrated and

leave. J. often would throw tantrums and cry and scream. Father could not care for J., could not

adequately feed J., and could not soothe J.

Father argued that he did not have the opportunity to visit S. nor was he offered services

to attempt to have S. returned home. However, father denied being S.'s biological father until he

received the paternity results. The paternity test results were not available until August 2012,

shortly before the JDR hearing to terminate father's parental rights. Prior to the paternity test,

father refused all services and visitation opportunities with S.

Code § 16.1-283(C)(2) allows the trial court to take into consideration the Department's

efforts to rehabilitate father prior to S. being in foster care. The Department had provided

numerous services to father, but father was unwilling to complete them or declined them.

> [S]ubsection C termination decisions hinge not so much on the
> magnitude of the problem that created the original danger to the
> child, but on the demonstrated failure of the parent to make
> reasonable changes. Considerably more "retrospective in nature,"
> subsection C requires the court to determine whether the parent has
> been unwilling or unable to remedy the problems during the period
> in which he has been offered rehabilitation services.

Toms, 46 Va. App. at 271, 616 S.E.2d at 772 (quoting Winslow, 40 Va. App. at 562-63, 580

S.E.2d at 466).

Here, father showed an unwillingness to remedy the problems which led to the children

being placed in foster care. He often refused services or did not complete the required classes.

Father did not improve his situation since the Department first obtained custody of J. in 2011.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

There was evidence that the children were doing well in foster care. J.'s condition improved dramatically. J. gained weight and received early intervention services. He continues to receive speech and feeding therapy, as well as occupational therapy. S. is healthy and happy. They are placed in the same foster home.

Therefore, based on the record, the trial court did not err in terminating father's parental rights to J. and S. pursuant to Code § 16.1-283(C)(2). The trial court did not err in finding that termination was in the children's best interests.

CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed.

Affirmed.