UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, Chafin and Senior Judge Annunziata

CRYSTAL DELLA PENNA

v.     Record No. 0586-13-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

MEMORANDUM OPINION[*]
PER CURIAM
SEPTEMBER 17, 2013

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Thomas J. Wilson, IV, Judge

(W. Andrew Harding, on brief), for appellant.  Appellant submitting
on brief.

(Rachel Errett Figura, Assistant County Attorney; David Ray Martin,
Guardian *ad litem* for the minor children; Miner, Martin, and Hahn,
on brief), for appellee.  Appellee and Guardian *ad litem* submitting
on brief.

Crystal Della Penna, mother, appeals a decision of the trial court terminating her parental

rights to her two minor sons.  She contends on appeal that the trial court erred in terminating her

parental rights despite the fact that she substantially remedied the causes of the removal under Code

§ 16.1-283(C)(2).  Upon reviewing the record and briefs of the parties, we conclude this appeal is

without merit.  Accordingly, we affirm the decision of the trial court.

Background

We view the evidence in the light most favorable to the prevailing party below and grant to

it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax Cnty. Dep't of Human

Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

The Harrisonburg Rockingham Social Services Department (HRSSD) became involved with the family in April 2009 when the two minor children were found walking on Main Street in Harrisonburg. While working with the family, HRSSD became concerned with both parents' lack of parenting skills, structure, consistency, and appropriate nutrition for the children. Intensive in-home services were provided starting about September 2009 that involved individual work with each parent, family sessions, and other services. By early 2010, the parents were estranged and the children resided with their father. However, on April 28, 2010, HRSSD took custody of the children, who were then ages eight and four. HRSSD determined the children could not be placed with mother because of her lack of housing and employment and because of her mental health issues. At the time, mother was receiving housing and benefits from Our Community Place, which HRSSD agreed was a charity of "last resort." HRSSD considered mother's arrangement as "very unpredictable."

Mother appealed the order transferring custody of the children to HRSSD and in August 2010, the circuit court entered an order containing several factual determinations, including: mother had a history of unstable housing, mother had personal instability that affected her emotional well-being, mother had multiple mental health diagnoses, mother's psychological evaluation indicated concerns about her functioning and her vulnerability, mother's testing showed an elevated risk of abuse, and mother was overwhelmed with caring for the children. In addition, the court found mother was not assuming responsibility for her own care at the time.

In August 2011, the children were returned to the custody of their father, who abducted the children to another state. In January 2012, the children were back in foster care. Meanwhile, mother still had housing, employment, and financial concerns. Although mother participated in supervised visitation with the children, she refused to participate in any of the recommended mental health services and was "not very cooperative" with the parenting education services provided to

her.  An HRSSD employee testified mother would "shut down" or "storm out" of the parenting sessions.  Mother participated sporadically in individual counseling, and she participated in her anger management program.

Mother was employed for a period of time in 2011, however, by 2012, she was again unemployed.  HRSSD encouraged her to seek employment, and mother responded either that she was receiving unemployment or it was "Satan's lies."  She sometimes would "shut down."  Mother was receiving housing and financial assistance from a new support group but she was vague about the specifics of that arrangement.  HRSSD discussed with mother her need to be financially independent and to be able to address the needs of the children.  Mother would respond in a manner that led HRSSD to assume her church was supporting her.  Mother has not been employed since 2011 or early 2012.

Mother also struggled in the supervised visitation with the children.  At most of the visits, mother would play loud music or religious preaching to "calm her down."  HRSSD employees found the music distracting and stated it made mother's interaction with the children difficult.  The children also indicated the music upset them, and one of the children wrote a note to mother asking her to stop playing the music during the visitation.  An HRSSD employee testified mother went "stone cold" after reading the note and was affected during the rest of the visit.  An HRSSD employee also observed that mother did not seem to be aware of the needs of the children.  In addition, one of the children avoided interacting with mother during visitations and both children exhibited aggressive behaviors that were not observed when the children were with their foster family.  Mother struggled to help the children with their homework assignments.

Evidence was presented that mother had issues during meetings with the children's school officials and in discussing their educational needs.  Mother also often acted inappropriately with professionals providing services to the children.  She would sometimes be angry or rude.  In

addition, mother exhibited anger after an eye doctor appointment for one of the children and she remarked that if the child prayed about his impaired vision he would not need glasses. She made a similar remark about one of the children's complaint of back pain when she told the child that if he would pray about it the pain would cease.

Dr. Joann Grayson, a licensed clinical psychologist, evaluated mother in 2010 and 2012. In the 2012 updated evaluation report, Dr. Grayson opined that mother presented as a "very dependent" person who now seemed dependent on her church and friends who had supported her over the past two years. Mother had expressed "little motivation" to get a job, and Dr. Grayson believed employment would likely be a challenge for mother because of her limited work experience. Dr. Grayson expressed concern about mother's ability to parent. Dr. Grayson acknowledged mother had "shown some progress," however, she stated "challenges remain." Dr. Grayson noted that mother is

> poorly positioned to become self-supporting; she is just starting to learn positive parenting skills and her application of skills is variable; sometimes she moves slowly and under-reacts causing her problems in supervising [the] children; other times she is hasty and impulsive; she is either unaware of her children's functioning and needs or she is too defended to discuss their needs; she resists having her children see doctors and dentists . . . she is overly dependent upon others.

Dr. Grayson opined that if the children were placed in mother's care, HRSSD "should be prepared to provide intensive in-home services for all of their growing years (for an indefinite time period)." She also recommended that placement with mother should not take place until mother had demonstrated she can maintain employment for six months or more.

The guardian *ad litem* had been involved with the family since 2010. He also acknowledged mother had made some positive changes in her life since 2010. However, he expressed concern about mother's refusal to participate in the recommended mental health services. He stated mother had times when she improved her situation, but then things would

"fall apart" and she would return to a pattern of being dependent on others. The guardian

*ad litem* reported that the past year had been the most stable year in the lives of the children. The

children have bonded with their foster family and have shown improvements in their behavior

and education. The children have expressed a desire to remain with their foster family.

The trial court terminated the residual parental rights of mother, and mother appealed that

decision to this Court.

Analysis

"'In matters of child welfare, trial courts are vested with broad discretion in making the

decisions necessary to guard and to foster a child's best interests.'" Id. at 128, 409 S.E.2d at 463

(quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). The trial court's

judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless

plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364

S.E.2d 232, 237 (1988).

A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed twelve
> months from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

> [S]ubsection C termination decisions hinge not so much on
> the magnitude of the problem that created the original danger to
> the child, but on the demonstrated failure of the parent to make
> reasonable changes. Considerably more "retrospective in nature,"
> subsection C requires the court to determine whether the parent has
> been unwilling or unable to remedy the problems during the period
> in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005)

(quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

The trial court stated it carefully reviewed all of the more than 100 pages of exhibits, finding that Dr. Grayson's reports were of great importance in analyzing the case. The court noted that in 2010, there were recommendations for mother to obtain a psychiatric examination and to find employment. However, mother never addressed her mental issues and she has not only failed to find a job, but she has made minimal efforts to do so. The trial court also stated that in 2010, mother displayed a reluctance to parent and she had difficulty in solving problems with the children. She continues to exhibit these characteristics. The trial court referenced Dr. Grayson's observation that mother's attempts to maintain self-control consume most of her energy. Mother continues to show little desire to work and she continues to have a dependence on others, although she has made some efforts toward improving her situation.

The trial court expressed concern over mother playing the loud music and sermons during her scheduled visitations, despite being informed that this interfered with the quality of the visits. The trial court found it extremely important that the case worker saw "no increase" in mother's parenting capacity after she supervised numerous visitation sessions. The trial court found that mother "simply cannot meet the [children]'s needs." The trial court further found that since the children entered foster care in 2010, mother has made some progress, but she has failed to substantially remedy the major issues that contributed to the removal of the children—mainly her mental health, housing, and employment issues. The court also noted the guardian *ad litem's* recommendation that termination was in the best interests of the children.

Thus, mother did not demonstrate her ability "within a reasonable period of time . . . to remedy substantially the conditions which led to or required continuation of the child[ren]'s foster placement, notwithstanding the reasonable and appropriate efforts of [the Department]." Code

§ 16.1-283(C)(2). Furthermore, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). The record contains sufficient evidence that it was in the best interests of the children to terminate the residual parental rights of mother.

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold."

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (citations omitted).

Accordingly, the trial court did not err by terminating mother's residual parental rights to the children. For the foregoing reasons, the trial court's ruling is affirmed.

Affirmed.