COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, Malveaux and Senior Judge Annunziata

BETTINA DORR

v.      Record No. 0966-17-3

LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES                              MEMORANDUM OPINION*
                                                    PER CURIAM
DANIEL WAYNE DORR, SR.                          FEBRUARY 6, 2018

v.      Record No. 1529-17-3

LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
F. Patrick Yeatts, Judge

(James J. Angel, on brief), for appellant Bettina Dorr.  Appellant
submitting on brief.

(Killis T. Howard, on brief), for appellant Daniel Wayne Dorr, Sr.[1]
Appellant submitting on brief.

(Hope R. Townes, Assistant City Attorney; Joyce M. Coleman,
Guardian *ad litem* for the minor child, on briefs), for appellee.
Appellee and Guardian *ad litem* submitting on briefs.


Bettina Dorr (mother) and Daniel Wayne Dorr, Sr. (father) appeal an order terminating their

parental rights to their child, D.[2]  Both parents argue that the circuit court erred by terminating their

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Subsequent to briefing, Attorney Howard died, and Attorney Sarah W. Bell has been
appointed to represent Daniel Wayne Dorr, Sr.

[2] We will refer to the minor children by their initials.

parental rights. Upon reviewing the record and briefs of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

Mother and father are the biological parents of D., who was born in 2012. Father also is the biological parent to J., who was born in 2004.[3] Child protective services (CPS) first became involved with the family in 2011, prior to D.'s birth, because of concerns about the conditions of the home. In September 2013, after D.'s birth, CPS received a complaint about the condition of the family's home. When CPS went to the home, the worker discovered a house with "deplorable conditions." The house smelled like urine and feces. The family's five cats were eating dirty diapers, and the litter boxes were full. There were overflowing garbage bags in the house. Father told CPS that he and mother were "overwhelmed and too depressed," so the housework had "gotten away from them." He agreed to clean and maintain the house.

On July 18, 2014, CPS received another complaint about the condition of the home and the parents' ability to care for the children. When CPS went to the home, there were eleven cats present, and the house smelled of cat urine. CPS recommended services for D., who was diagnosed with autism spectrum disorder and nonverbal.

On July 28, 2014, CPS received another complaint because father "popped" J. in the mouth and caused her nose to bleed.

From October 28, 2014 through June 15, 2015, a CPS worker provided ongoing services to the family. The condition of the home did not improve. The house was dirty and continued to

---

[3] J.'s mother is deceased.

smell of urine and feces. D. was often in a pack and play or his crib. The parents did not follow the recommendations about how to maintain the house.

Father reported numerous mental and physical problems, including depression, traumatic brain injury, sexual abuse as a child, knee and back problems, diabetes, incontinence, and morbid obesity. Mother reported numerous mental problems, including depression and anxiety. She described herself as "low level/high-functioning mentally retarded." Mother stated that as a child, she suffered from sexual, physical, and verbal abuse, as well as neglect. She admitted to attempting suicide once. CPS referred father and mother to Adult Protective Services (APS). APS provided cleaning supplies to the family. APS recommended father to an obesity fitness program, but he did not participate. APS closed their cases due to the parents' lack of compliance.

CPS referred mother and father to parenting classes. However, the parents did not regularly attend the classes, so they did not graduate.

CPS referred mother and father for psychological and neurological evaluations with Dr. James Anderson. Both parents participated in the evaluations on April 14, 2015. Father's tests revealed that he was in the high average range of intellectual functioning, but he had a low average in verbal comprehension. Dr. Anderson diagnosed father with "[p]ersistent depression with anxious distress versus unspecified depression, dependent and schizoid avoidant personality traits." Dr. Anderson explained that father's depression would "very likely limit his emotional availability or ability to relate in a sufficiently supportive, empathetic and nurturing manner." Dr. Anderson also noted that father had "very limited stress tolerance or tolerance for the kinds of demands that children make on a parent's time and energy," and "a special needs child . . . is very likely to make more significant demands on the parent's time and energy than a child who is well functioning."

Dr. Anderson also evaluated mother. Her tests revealed that she had low intellectual functioning. Dr. Anderson diagnosed mother with "persistent depression[,] . . . [p]ost traumatic

stress disorder and personality disorder with dependent, avoidant, and self-defeating characteristics." Dr. Anderson surmised that since mother had "such a lengthy history of depression," "successful treatment in her case would be more about management than cure." Due to mother's limited intellectual functioning, Dr. Anderson opined that mother would "very likely . . . have increasing difficulty socializing the child." Dr. Anderson was "pessimistic about [her] ability to provide for the additional needs of a child with autism."

On June 15, 2015, CPS received a complaint about physical neglect of D. and the conditions of the home. On June 16, 2015, CPS went to the home. The house smelled like feces and cat urine. There were two full litter boxes and eight cats in the home. According to the CPS worker, every room was "cluttered and dirty." There was trash throughout the home. The kitchen was full of dirty dishes, bottles of curdled milk, and dirty clothes. Father told the CPS worker that they "caught them on a bad day." When asked if he thought the home was safe and appropriate for the children, father responded negatively.

On June 16, 2015, CPS removed D. and J. from the home "due to the chronic neglect of the children, unsafe and unhealthy home conditions, the parent's significant mental and emotional health, the parent's failure to maintain a clean and safe home environment, and the parent's failure to follow through with the many services provided [by] DSS and other agencies." On June 24, 2015, the Lynchburg Juvenile and Domestic Relations District Court (the JDR court) adjudicated the children as abused or neglected.

Once the children were in foster care, the Lynchburg Department of Social Services (the Department) offered numerous services to the parents. The Department referred them to counseling, parenting coaching, and a nurturing parenting program. Mother and father participated in those services offered.

The Department also provided weekly supervised visitations with the children. Mother and father were consistent with attending visitations, except for the month prior to the circuit court hearing due to illnesses. The social worker explained that the "visits required ongoing intervention by the parenting coaches." The parenting coaches had to remind the parents how much supervision D. needed and how to interact with D.

The Department referred father to a weight loss clinic at the YMCA and paid for a six-month membership for him. Father "occasionally" attended, so he did not see improvement.

Neither mother nor father worked. Father applied for disability, but was denied. Mother received disability and was involved with a program that provided job training.

Since being in foster care, D. has received medication and therapy. He was diagnosed with autism spectrum disorder and attention deficit disorder. He participates in therapy at an autism clinic and has an early intervention caseworker. D. also receives occupational therapy, physical therapy, and speech therapy. D. has a tracking bracelet as a safety measure because "of his impulsive running [and] dangerous behaviors."

Vincent Jones is a mental health therapist, parenting instructor, and counselor. Jones testified that he has met weekly with father since August 2015. Jones stated that father was compliant with services. Jones observed approximately sixty-seven visits between the parents and the children. Jones indicated that father had improved with his interactions with D. over time. When asked whether he had any concerns about D. returning to father's care, Jones replied that he thought father would be kind, gentle, and involved; however, Jones was "extremely" concerned about father's physical limitations because D. was very active. Jones noted that father has "significant health problems and health issues physically," which affect his ability to effectively parent D. For example, Jones said that if D. were to run away, father would not be able to retrieve him.

Mary Rice is a licensed professional counselor. Rice has provided outpatient counseling and parenting education services to mother. Rice has been meeting weekly with mother since August 2015. Rice observed between twenty-five and thirty visits between mother and the children. Initially, Rice noticed that mother was resistant and reluctant around D.; however, mother's confidence grew over time. Rice was very concerned about D.'s safety during the visits, and she was trying to get mother to understand that D. demands extreme supervision. Rice testified that she did not think that mother had a good understanding of D.'s needs. Rice expressed concern about mother's problem-solving ability and decision-making skills because mother can become overwhelmed and panic, which could become a safety issue for D. Rice explained that it was difficult for mother to grasp D.'s ever-changing, complex behaviors and learn how to deal with them.

On December 2, 2016, the JDR court terminated mother and father's parental rights to the children. Mother and father appealed to the circuit court. On April 14 and June 9, 2017, the parties presented their evidence and argument. At the conclusion of the hearing, the circuit court terminated mother and father's parental rights to D., but not J. The circuit court approved the foster care plan's goal of adoption for D. These appeals followed.

ANALYSIS

Both parents argue that the circuit court erred by terminating their parental rights to D. "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citation omitted). When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

The circuit court terminated their parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

While issuing its ruling, the circuit court explained that "it's not really about the parents' willingness, it's about their ability to provide for these children in the manner in which they need to be cared for and – and in the manner in which their needs dictate . . . ." The circuit court noted that D. has special needs due to his diagnosis with autism spectrum disorder. The circuit court found that mother and father's limitations affect their ability to provide what D. needs.

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Father and mother argue that they improved the situation that led to the children being removed from the home. Father and mother cleaned the home and reduced the number of cats that they had. The parents emphasize that in an inspection after the children were in foster care, the Department found the residence to be clean and appropriate. Father and mother also note that they participated in the Department's services and complied with the Department's requirements.

Contrary to father and mother's arguments, the evidence supports the circuit court's rulings. The Department removed the children for a multitude of reasons, not just the condition of the home. Father continues to have physical limitations and depression, which impact his ability to care for D. Mother's limited cognitive disability affects her decision-making and problem-solving skills. Mother does not understand D.'s needs and would become overwhelmed.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The evidence proved that D. was doing well in foster care. He receives speech therapy, occupational therapy, and physical therapy. He receives services through the public school and an autism center. Although D. was nonverbal when he entered foster care, he has learned sign language and is expanding his vocabulary. The evidence supported the circuit court's finding that it was in D.'s best interests to terminate mother and father's parental rights.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.