COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Petty, Chafin and Senior Judge Annunziata


DANIEL HENSLEY

v.      Record No. 2351-13-3

HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT

MEMORANDUM OPINION[*]
PER CURIAM
MARCH 18, 2014


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
James V. Lane, Judge

(Avery B. Cousins III; Cousins Law Offices, on brief), for appellant.

(Rachel Errett Figura, Assistant County Attorney; Michael D. Beckler, Guardian *ad litem* for the minor children, on brief), for appellee.


Daniel Hensley (father) appeals an order terminating his parental rights to his children, S.H. and M.H. Father argues the trial court erred by finding there was sufficient evidence to terminate his parental rights pursuant to Code § 16.1-283(C)(2). He also contends the trial court erred in not ordering the Harrisonburg Rockingham Social Services District (HRSSD) to explore relative placement with his sister. Upon reviewing the record and briefs of the parties, we conclude the trial court did not err. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

In his opening brief, father concedes there were "adequate grounds" for the removal of the children on March 14, 2012. He also concedes reasonable services were offered by HRSSD

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

to remedy the conditions that led to the removal. However, father contends HRSSD did not offer "appropriate services" to him, but rather focused on providing services to the children's mother.

While it is true that HRSSD offered numerous services to the mother who had issues with substance abuse, mental stability, and child care skills, the evidence shows services were also offered to father. Leann Tofsrud, a social worker, testified she began working with the family in 2010. In July 2010, M.H. was adjudicated abused or neglected and S.M. was adjudicated at risk.[1] Mother was charged with felony child abuse and neglect. Tofsrud testified HRSSD worked with both parents and "put a lot of support services in there for them." Tofsrud specifically stated that due to concerns that mother would be sentenced to jail, "it was important to make sure that [father] could provide the care needed" for both children so he could be their caretaker if mother was incarcerated. HRSSD was also concerned that mother's continuing substance abuse issues and "serious mental illness" would result in father becoming the primary caretaker of the children.

Tofsrud testified HRSSD provided five hours of in-home services per week to teach father the parenting skills that he was lacking. Tofsrud stated five hours per week was the maximum amount of time they could provide for in-home services. Tofsrud stated HRSSD provided a service to assess the children, Healthy Families worked with the parents and the children, and the parents were provided parenting classes. She estimated she maintained weekly contact with the family.

Tofsrud also testified there were concerns about father not taking appropriate care of the children's hygiene--for example, their clothes were often dirty and he refused to cut their nails. The parents did not follow through with eye appointments for S.M. In addition, Tofsrud questioned whether father was meeting the needs of S.M. who was "very, very aggressive" with

---

[1] M.H. was born on March 16, 2010, and S.M. was born on February 13, 2009.

her younger sibling and had difficulty communicating. Tofsrud described an incident that took place in the family home where she observed father "struggling to create a boundary" for S.M. when she became violent toward her younger brother. At that time, father was the primary caretaker of the children.

Tofsrud also stated the family received financial assistance for daycare and father often left the children in daycare until after dinner so they would have eaten a meal before he retrieved them. On some of the occasions when the children were left in daycare past their scheduled pick-up time, father was seen walking on the streets of Harrisonburg.

Tofsrud also testified that at one point HRSSD asked mother to leave the home. Tofsrud met with father's employer to work out a plan to enable him to care for the children. She then learned that father's supervisor sometimes retrieved the children from daycare and fed and bathed them. This was a concern because HRSSD had worked with father for many months, yet he had not made progress in meeting the needs of his children. Rather, he continued to rely on others to care for his children.

Tofsrud testified that after HRSSD had been working with the family for over one year, father had not made any progress with any of the services HRSSD had provided. He remained dependent on others to take care of the children. He appeared to be overwhelmed and struggled with being a single parent. Mother returned to the home in September 2011, however, she continued to suffer with substance abuse issues. After HRSSD went to the home and found mother alone with the children acting "agitated" and "sporadic" and the house in disarray, the children were removed from the home and placed into foster care in March 2012. Tofsrud testified father had not reported to HRSSD that mother was continuing to abuse substances.

Nicole Zepp, the social services worker for the children, testified she pursued relative placement for the children after their removal from the home. However, none of the relatives

identified by the parents responded to the relative placement letter. While the children were in foster care, father was referred to alcohol abuse counseling and parenting education classes. He had supervised visits with the children. A clinical psychologist performed a psychological evaluation of father. Father continued to maintain an apartment with financial assistance, but Zepp testified he was typically behind in his rent payments. He was also not current on his child support payments while the children were in foster care.

Zepp also testified father did not maintain the home in an appropriate condition for the children. She stated it was dirty, smelled of cigarette smoke, and was full of various items. Father continued to work at a fast-food restaurant, and he donated plasma as a source of income. Zepp stated father worked less than thirty hours per week. Father and mother appeared to have an unstable relationship. However, Zepp stated they indicated they wanted to parent the children together.

Zepp met with father in late August 2013, and he indicated he knew he could not take care of the children at that time, but he wanted to work toward getting them back. However, Zepp also stated father did not accept any responsibility for his actions that contributed to the children's placement in foster care and he indicated he did not understand why they were there.

Zepp testified M.H. is in a potential adoptive home and is doing very well in the home. S.M. is in a therapeutic foster home where her needs are met. This home is also a potential adoptive home where the foster care mother has "a unique way of parenting" and is a calming influence on S.M.

From June 2012 to January 2013, Rebecca Simmons handled parenting education with father and supervised his visits with the children. She testified father had previously participated in parenting classes provided by another group before Simmons became involved in the case. She stated that at the supervised visits father displayed an inability to place the children's needs

above his own.  Father had a "very difficult" time interacting and communicating with the children, and he was unwilling to take suggestions from Simmons.  Simmons spoke with father "at length about his interactions," and she did not see any changes in his presentation toward the children.  M.H. remained detached during the visitations, and S.M. often had tantrums.  During the visits, father would also engage in lengthy phone calls with mother during which they frequently argued.  When mother was also at the visitation, the parents often argued and father would undermine mother with degrading comments.  Father failed to recognize the negative impact their relationship had on the children.  Father was defensive when Simmons discussed his parenting skills with him, and his progress was "minimal."

Rebecca Skaflen took over father's case from Simmons in January 2013.  She supervised visitations with both parents, and she also stated there was conflict and distress during the visits with the children.  The children displayed increased disruptive behaviors.  Skaflen also stated that when presented with an example of a negative interaction he had with a child, father would indicate he recognized the negative behavior and would "work on" changing it, but nothing ever changed.  She testified father is "challenged" with setting limits, giving direction, and actually parenting versus babysitting.  The children did not respect or trust father.

Skaflen testified father needed to improve his financial situation as he was working only part-time at the fast-food restaurant.  Father did complete his GED.  As of the spring of 2013, father's apartment remained unsuitable for raising children due to the lack of cleanliness.

A licensed professional counselor testified S.M. is in her third foster care placement.  She entered foster care exhibiting agitated and irritable emotional behavior and was diagnosed with PTSD.  The counselor has seen progress with S.M.'s emotional issues and her developmental skills while in foster care.

Father testified he and the children's mother are no longer in a relationship. He testified he was late picking up the children from daycare only when he lacked transportation. Father does not have a driver's license and has never had one. Father stated he was no longer consuming alcohol or smoking cigarettes. He has a temporary job holding signs for a furniture store that is going out of business. He continues to donate plasma as a source of income. Father attends substance abuse counseling, and he testified he has changed since the children went into foster care. He stated he has cooperated with the services provided by HRSSD and he will cooperate with services needed for S.M. should he regain custody.

Father's sister, Sharon Hensley, testified at the hearing that although she had never inquired of HRSSD to be considered for a relative placement, she would be willing to care for the children if father could not do so. She also stated she first learned about the termination of father's parental rights two weeks before the hearing in circuit court. Father had reported he was estranged from his sister but Hensley testified she was in contact with father on approximately a monthly basis. Hensley also testified she had seen father's children on their birthdays and on several Christmas holidays. Hensley stated she had last seen the children in March of 2012 and the children had never been to her home.

The guardian *ad litem* reported that M.H. is "getting along famously with his foster parents" and is very happy. He stated that S.M.'s foster parent "has turned her around in a spectacular way." The guardian *ad litem* opined that returning the children to father would cause them to regress and it is in the best interests of the children to terminate father's parental rights.

In its ruling, the trial court stated it had no doubt that father loves his children, but the issue was his inability to "step up" and start correcting the problems immediately. The trial court expressed concern that the children were entitled to stability and father had done "too little too late." The court noted the children were in a good place and seemed to be moving forward. Yet

father had "disregarded what was in front of him." The trial court found it was in the best interests of the children to terminate father's parental rights. In addition, the trial court noted that father's sister's interest in gaining custody of the children was untimely.

"'In matters of child welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

A court may terminate parental rights if it finds, based upon clear and convincing evidence, it is in the best interests of the child and that:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Although father focuses much of his argument on his financial circumstances, improving the family's finances was not the only issue father faced in re-gaining custody of his children.

Evidence was presented that father lacked appropriate parenting skills and, despite the efforts of HRSSD in working with him in this area, father exhibited little change in his ability to be a caretaker for the children. When he was the primary caretaker, the home was kept in disarray, the children and their clothes were dirty, father depended on others to help him with the children, he left the children in daycare until after dinner time, and he had difficulty meeting the emotional needs of the children. Father appeared to be overwhelmed with caring for two children. He did not communicate well with the children, and the children did not respect or trust father.

Furthermore, the social worker testified father did not demonstrate that he had corrected any of his parenting deficiencies while the children were in foster care. Even during supervised visitation, he continued to prioritize his needs over the needs of the children and he often argued on the phone at length with mother while ignoring the children. Father failed to recognize that his unstable relationship with the children's mother had a negative impact on the children. In addition, he was unable to control S.M. who suffered from emotional issues. Thus, the evidence showed father's inability to parent the children contributed to their removal and his failure to correct these deficiencies contributed to the trial court's decision to terminate his parental rights.

As stated above, HRSSD provided father with multiple services to assist him in gaining the skills necessary to parent the children. Father also received financial assistance with daycare and his rent on the apartment. Skaflen testified she discussed with father improving his financial condition and he stated it was important for him to maintain job stability at the fast-food restaurant, although he was working there less than forty hours per week. She testified father "did not appear to be interested in looking for other work."

Importantly, both children are more stable and are improving in their foster homes, which are both potential adoption homes. The guardian *ad litem* for the children opined that returning them to father's custody would cause them to regress.

Thus, father did not demonstrate his ability "within a reasonable period of time . . . to remedy substantially the conditions which led to or required continuation of the child[ren]'s foster placement, notwithstanding the reasonable and appropriate efforts of [the Department]." Code § 16.1-283(C)(2). Furthermore, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). The record contains sufficient evidence that it was in the best interests of the children to terminate the residual parental rights of father.

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold."

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (citations omitted).

Code § 16.1-283 provides that a trial court may transfer custody of a child to the child's relative if that relative:

> (i) is found by the court to be willing and qualified to receive and care for the child; (ii) is willing to have a positive, continuous relationship with the child; (iii) is committed to providing a permanent, suitable home for the child; and (iv) is willing and has the ability to protect the child from abuse and neglect . . . .

Code § 16.1-283(A1).

The evidence showed HRSSD contacted three relatives identified by father for potential relative placement and received no response from those relatives. Other relatives of mother were excluded for various reasons. Throughout the process, father reported he was estranged from his sister, but Hensley testified she had been in contact with father on about a monthly basis. She

testified she first learned about the lower court's termination of father's parental rights only two weeks before the hearing in circuit court. Hensley also stated father had informed her of "some of" the children's special needs, but she did not ask him questions about the situation.

Hensley testified that in the past she would see father's children on their birthdays and on some Christmas holidays only. She reported father was a good parent and she had seen no concerning interactions between father and mother. Hensley stated she last saw the children in March of 2012 and the children had never been to her home. Hensley had not visited the children while they were in foster care. Hensley is twenty-six years old, and she has not raised any children. She was unsure whether she had any prior convictions. The trial court indicated Hensley's interest in obtaining custody was untimely.

Moreover, the record supports the finding that Hensley was not a viable relative placement. She appeared to have had limited contact with the children and little knowledge about their development and needs. She had no experience in raising children, and the evidence did not show she was qualified to care for these children who both had significant developmental issues related to their abuse and neglect.

Accordingly, we conclude that the trial court did not err in terminating father's residual parental rights to S.H. and M.H. and in declining to place the children with Hensley, father's sister.

For the foregoing reasons, the trial court's ruling is affirmed.

Affirmed.