COURT OF APPEALS OF VIRGINIA

Present:   Judges Decker, Malveaux and Senior Judge Clements
Argued at Richmond, Virginia


HOLLY MALONE

MEMORANDUM OPINION* BY
v.        Record No. 0472-17-2        JUDGE MARY BENNETT MALVEAUX
                                      OCTOBER 31, 2017
DINWIDDIE DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Dennis M. Martin, Judge

Linwood T. Wells, III, for appellant.

Joan M. O'Donnell (M. Brooke Teefey, Guardian *ad litem* for the
minor children; Olde Towne Lawyers, LLP; Teefey Law, P.C., on
brief), for appellee.


The Circuit Court of Dinwiddie County ("circuit court") entered orders terminating the

residual parental rights of Holly Malone ("mother") to each of her three children.  She appeals

those orders, arguing that the evidence was insufficient to warrant termination of her residual

parental rights under Code § 16.1-283(B).[1]  For the following reasons, we conclude that the

evidence was sufficient to support the circuit court's findings and therefore affirm.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Mother also assigns error to the circuit court's finding that the evidence was sufficient
to warrant termination of her residual parental rights under Code § 16.1-283(C)(2).  "Code
§ 16.1-283(B) and (C)(2) set forth individual bases upon which a petitioner may seek to
terminate residual parental rights."  City of Newport News Dep't of Soc. Servs. v. Winslow, 40
Va. App. 556, 563, 580 S.E.2d 463, 466 (2003).  Thus, a conclusion that the termination of
mother's parental rights under one subsection of Code § 16.1-283 was warranted means we need
not consider whether termination was also appropriate under another subsection.  See, e.g.,
Cumbo v. Dickinson Cty. Dep't of Soc. Servs., 62 Va. App. 124, 127 n.2, 742 S.E.2d 885, 886
n.2 (2013); Butler v. Culpeper Cty. Dep't of Soc. Servs., 48 Va. App. 537, 548-49, 663 S.E.2d
196, 201-02 (2006).  Here, because we conclude that the circuit court did not err in terminating

I.  BACKGROUND

We review the evidence in the light most favorable to the Dinwiddie County Department of Social Services ("DSS"), the party that prevailed below, affording it all inferences that are fairly deducible from the evidence.  See Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 40, 764 S.E.2d 284, 287 (2014).

July 2013–March 2014:  The initial involvement of DSS

In July 2013, DSS received a report alleging neglect of mother's three children, J.A., N.N., and J.I.  J.A., a boy, was eight years old at that time, N.N., a girl, was four years old, and J.I., a boy, was two years old.  DSS staff visited mother's home, where she lived with her children and the children's father;[2] her mother, who was physically impaired; and mother's two adult sisters, one of whom had her own two children living with her.  Gloria Browder-Parham, a DSS worker who participated in the home visit, testified during the termination proceedings that the home was infested with roaches, the floor was very dirty, and there was a hole in the bathroom floor.  The residents had to use a screwdriver to turn on the water in the bathroom, and the children were dirty and had not been bathed.  In the kitchen, dishes with dried food on them were piled in the sink and on the counter.  There was little food, and items in the refrigerator were uncovered and stale.  Mother shared a single room with all three of her children and the children's father.

DSS inquired about mother's financial circumstances and learned that Georgia Moore, mother's maternal aunt, normally handled the family's money and brought them food as needed.  Moore was the payee for mother's Supplemental Security Income ("SSI"), which she received

_____

mother's residual parental rights under Code § 16.1-283(B), we need not review its decision to terminate her parental rights under Code § 16.1-283(C)(2).

[2] Father left the home within one to two months of DSS' initial visit.  His parental rights were terminated in separate proceedings.

for intellectual disabilities. Mother also received assistance through the Supplemental Nutrition Assistance Program ("SNAP"), but her SNAP card was in the possession of the children's father. Moore was responsible for ensuring that rent and utility bills were paid on time, and provided mother with spending money each month.

Later that week, DSS discovered that one of mother's sons and one of her sister's children suffered from untreated ringworm. A doctor's visit was arranged for the children, but although mother was given ointment to treat the condition, her son's ringworm got worse and her daughter also contracted ringworm. DSS determined that although mother opened the ointment, she was unable to administer the medicine at the appropriate times and in the correct doses.

DSS continued to receive reports that mother's children were being neglected, including accounts of filthy household conditions, excessively soiled diapers, and insufficient food. DSS also received reports that the children sometimes physically attacked mother. The agency opened a prevention case to monitor the progress of mother and the children's father in meeting the children's needs and providing for their basic care, but observed little improvement.

March 2014–March 2015: Service provisions and preliminary protective orders

In March 2014, DSS arranged for Open Arms Family Services ("Open Arms") to provide mother with an in-home parent aide and other assistance. Open Arms staff treated the home for roaches and removed and cleaned clothing and bedding. The parent aide, who was in the home three or four days each week for three to four hours per visit, assisted mother with budgeting, managing food and meal planning, hygiene, and maintaining a safe home. Open Arms staff also mentored the children.

Around June 20, 2014, DSS received a call regarding conditions in mother's home. Browder-Parham visited the home and found that more people were living there, as each of mother's sisters had recently had a child and the father of one of those children had moved in.

Browder-Parham observed human feces in the hallway that had been "trampled through." She asked if anyone was going to clean up the feces, but no one took any action. After a few minutes, she said that someone needed to clean up the waste. Eventually, one of mother's sisters used a towel or cloth to clean "just that one spot" before setting the waste on the kitchen table.

Browder-Parham also received a report, prior to or during June 2014, that the older son, J.A., was "very aggressive in the home" and had been involved in inappropriate "sexual behaviors." Later reports indicated that J.A. was involved in a sexual incident with a neighbor and sexual misconduct with his siblings. During home visits, Browder-Parham also witnessed the younger son, J.I., hit his mother when he did not get what he wanted.

On June 24, 2014, DSS filed petitions alleging abuse or neglect of each child and seeking emergency removal orders and protective orders for each. On July 1, the Dinwiddie County Juvenile and Domestic Relations District Court ("J&DR court") entered preliminary protective orders for all three children. Among other things, the protective orders required mother to: ensure that each child received a daily bath and all prescribed medications; prevent each child from engaging in physical altercations; provide sufficient food and supervision for each child; comply with her service providers' daily household cleaning schedule and work with them to create weekly meal plans and grocery lists; and participate in a psychological evaluation. Those orders were extended in August and December 2014. The J&DR court specifically noted in each order that the "conditions (feces, lack of supervision, decaying food) in [the] household create risk of death, disfigurement or impairment of bodily or mental functions."

Although parent aide services were discontinued in September 2014, the family continued to receive other in-home services. DSS workers visited the home several times each week to ensure that the home was clean and safe and the children's basic needs were being met. Mother made some efforts to attempt to care for the home, and took turns with her sisters

preparing meals and performing chores. However, mother was unable to complete many basic, daily childcare tasks without direction by DSS or other support staff. During Browder-Parham's frequent home visits, she observed no significant change in mother's parenting skills. DSS ultimately determined that mother remained unable to consistently care for and meet the basic needs of her children. Further, due to mother's cognitive limitations and the special needs of the children,[3] the children remained at risk for abuse and neglect while they continued to be in mother's care.

March 2015–December 2015: Foster care service plans and additional service provisions

On March 6, 2015, the J&DR court entered adjudicatory orders for all three children, finding each was abused or neglected as defined by Code § 16.1-228. The children were placed in the custody of DSS. When the children were removed from mother's home, each was dirty and had a foul body odor. The two youngest children were suffering from tooth decay. J.I. required dental surgery, and N.N. had to have some of her teeth pulled. On April 28, 2015, the J&DR court entered orders approving foster care service plans for each child with an initial goal of returning them to mother's home and a concurrent goal of adoption.

At that point, after more than a year of providing mother with services through Open Arms, DSS began to provide services through National Counseling Group ("NCG"). Browder-Parham testified that DSS decided "to put a different set of eyes on the situation because [Open Arms] had been in the home for a while and they felt they had basically exhausted the services that they could offer to have any significant change." Through NCG, DSS provided mother with a parenting coach who visited with mother two to three days each week for at least two hours a day. These services were provided to mother for three to four

---

[3] Browder-Parham testified that J.I. is "on the autism spectrum" and that N.N. was diagnosed with "post[-]traumatic stress mathematics disorder and adjustment disorder with mixed disturbance of emotions and conduct."

months. As with Open Arms, one of the goals of NCG was to assist mother with her personal hygiene, which continued to be an issue.

During 2015, mother attended and completed parenting classes through the Virginia Cooperative Extension Service. By July, the household—including mother, her two sisters, and their disabled mother—had moved to a new house. By November, mother was living in her own house which she leased with her aunt, Georgia Moore. When a DSS worker visited the home in November 2015, there was trash in small bags in the kitchen and no trash in the trash can, "but there was something molding/spoiling in the bottom [of the can], there were roaches, []dishes in the kitchen sink that appeared to have been there for a while, and [the] water was turned off for the second time since October." DSS staff also reported trash piled on the floor and back steps of the home and that a window in the home could not be closed.

DSS scheduled two occasions when the children were to visit mother in her new home. The first visit took place during the Thanksgiving or Christmas holidays of 2015. Browder-Parham, who was present for the visit, testified that the defective window in mother's home had not been repaired and was still open and that mother's only source of heat at that time was an electric heater in the front portion of the house. To provide further heat for the visit, mother opened her oven door. Browder-Parham explained to mother the hazard this presented to the children. The visit was completed at another location, and the second visit was cancelled due to mother's ongoing lack of adequate heat.

December 2015: Mother's psychological evaluation

Two clinical psychologists conducted mother's court-ordered psychological evaluation during November and December 2015. In their report, they concluded that mother's cognitive and emotional functioning is significantly impaired. In particular, they determined that her adaptive skills are "within the extremely low range indicating moderate to severe intellectual

- 6 -

disabilities" and that in the conceptual and social domain, she exhibits a "severe level of intellectual disability." They noted that DSS and NCG records "suggest that the support from parenting aids [sic] and coaching provided to [mother] for the past two years resulted in minimal improvement to care for the children and the house," and opined that mother's "intellectual disabilities explain the minimal success after exhaustive efforts of training with parenting coaches." The psychologists also concluded that mother's "skills at organizing information, utilizing working memory, mental flexibility and developing problem-solving strategies are all significantly impaired, and they greatly limit her ability to adapt. [She] has limited ability to organize schedules and plan meals for the family." Further, mother has "little understanding of written language or concepts involving numbers, quantity, time, and money. She will require significant support for problem-solving throughout life." The psychologists recommended that mother "continue to get assistance from her aunt for managing her money and spending" and that she be "assisted with supervision of activities of daily living and developing an awareness of cleanliness and hygiene. She needs a high level of structure and support to function in any environment."

Browder-Parham testified that the outcome of mother's psychological evaluation led DSS to file new foster care service plans seeking the children's adoption. On December 28, 2015, DSS filed petitions for permanency planning hearings and new foster care service plans.

January 2016–2017: Permanency planning orders, new foster care plans, and termination

The J&DR court entered permanency planning orders for the children on January 29, 2016, finding that termination of parental rights was in the best interest of each child and approving the goal of adoption. DSS petitioned for involuntary termination of mother's parental rights to her three children, pursuant to Code § 16.1-283(B) and (C). The J&DR court terminated mother's residual parental rights on August 23, 2016, finding clear and convincing

evidence to support termination under Code § 16.1-283(B) and specifically noting the applicability of subsection (B)(2)(a). Mother appealed to the circuit court, which heard the matter on January 17, 2017.

At the hearing, Browder-Parham testified as described above. She further testified that she had visited mother the previous week and that mother was unemployed at that time. One of mother's sisters was living with her, and mother's aunt continued to manage her bills. Browder-Parham asked mother what her plan would be if her children were returned to her home, and "she really did not have a plan. She just said that she would have her sister move out. And that was . . . the plan." Browder-Parham also expressed DSS' concerns about mother's ability to meet the special needs of some of her children. She stated that both Open Arms and NCG had worked with mother and informed DSS that they had exhausted the services that they could provide. When asked whether she observed conditions in mother's home getting worse, getting better, or staying the same between summer 2013 and the children's removal in March 2015, Browder-Parham replied that they "stay[ed] the same."

Mother testified at the hearing. She stated that the previous summer, she began work as a cleaner and worked eight hours per week. However, she had lost her job a few days previously after a "run-in" with her boss. Later, mother testified that she could still go back to her job if she wanted to, but that she didn't get along with her boss. She testified that she could not remember how much money she made, because "[m]y money was going on the card." She stated that her rent was $400 per month and that she paid her aunt half that amount, which she said was $100. When asked how much she received in SSI, mother replied, "I don't know because my aunt handles my check." When asked if she had made any preparations for the children to return to her home, mother replied, "I told my sister that she had to get out."

In its ruling from the bench, the circuit court quoted language from Code § 16.1-283(B)(2)(a) providing that a severe intellectual disability constitutes *prima facie* evidence of the conditions required by subsection (B)(2) for termination of residual parental rights. Noting that "there was 15 months plus the services from [DSS] . . . to the parent, services to the children before the termination of parental rights was filed," the circuit court concluded that mother "still [is] not taking care of herself. She doesn't have any idea what her household bills are. At some point in time there is no heat in the house." Further, "[t]he rooming in the house is inadequate . . . . [O]ne of her children has been involved in sexual activity that would be a danger to both of her [other] kids, yet she was going to put them in [the] same bedroom together." The circuit court found that the requirements of Code § 16.1-283(B) had been satisfied, and on March 3, 2017, entered orders terminating mother's residual parental rights to J.A., N.N., and J.I., pursuant to Code § 16.1-283(B) and (C)(2). This appeal followed.

## II. ANALYSIS

"When reviewing a decision to terminate parental rights, we presume the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). The circuit court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). "Therefore, in a case involving termination of parental rights, '[t]he trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Eaton v. Wash. Cty. Dep't of Soc. Servs., 66 Va. App. 317, 324, 785 S.E.2d 231, 235 (2016) (alteration in original) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).

In order to terminate residual parental rights under Code § 16.1-283(B), a court is required to make three findings based upon clear and convincing evidence. Butler v. Culpeper Cty. Dep't of Soc. Servs., 48 Va. App. 537, 547, 633 S.E.2d 196, 201 (2006); see Code § 16.1-283(B). First, the termination of residual parental rights must be in the child's best interests. Butler, 48 Va. App. at 547, 633 S.E.2d at 201. Second, the child must have suffered neglect or abuse that "presented a serious and substantial threat to his life, health or development." Code § 16.1-283(B)(1); see also Butler, 48 Va. App. at 547, 633 S.E.2d at 201. Third, the court must find that it is "not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent . . . within a reasonable period of time." Code § 16.1-283(B)(2); see also Butler, 48 Va. App. at 547, 633 S.E.2d at 201.

On appeal, mother argues that the circuit court erred in finding sufficient evidence to terminate her residual parental rights under Code § 16.1-283(B). Specifically, she argues that the evidence was insufficient to support findings under the second and third prongs described above.

A. Neglect or Abuse Presenting a Serious and Substantial Threat

Mother asserts that the evidence was insufficient to find that the neglect or abuse suffered by each of her children presented a serious and substantial threat to their life, health, or development. See Code § 16.1-283(B)(1). She acknowledges that when DSS first became involved with her family, her living conditions at that time constituted a neglectful environment that may have harmed her children's health or development. However, mother argues that whatever conditions initially may have existed ceased once she was living in her own home.

A review of the record reveals abundant evidence that mother's children suffered neglect or abuse presenting a serious and substantial threat to their lives, health, or development throughout their time living with mother. When DSS first became involved with mother and her

children, they were living in highly unsanitary conditions. Little food was available for the children, and their medical and dental problems were untreated. One child later was diagnosed with post-traumatic stress disorder, and another was violent toward mother when he did not get his way. The oldest child was engaging in inappropriate sexual activity. The children lacked adequate living space and were sharing a single bedroom with mother and their father. Further, mother was not in control of her own finances and funds for the children were only intermittently available. Despite intensive efforts by DSS, Open Arms, and other service providers, DSS saw no improvement in conditions during the nearly two years between their first contact with mother and the children's removal from the home.

Further, contrary to mother's argument, her move to a home of her own did not mean the previous conditions which resulted in neglect or abuse no longer existed. While the new home was less crowded, it contained roaches, molding or spoiling waste, improperly disposed of trash, a dirty kitchen, inadequate heat, and a water supply which repeatedly was turned off. Moreover, even in her new home, mother's cognitive limitations continued to negatively impact her ability to provide a safe and materially adequate environment for her children. Mother still was not in control of her finances, or even adequately aware of the financial demands upon her household. When DSS arranged a home visit during the holiday season in late 2015, mother tried to heat part of her home with an open oven, creating a hazard for her children. The conditions in the new home were so problematic that the visit had to be completed at another location and a second home visit had to be cancelled. As late as the termination hearing, mother had no plan for how to accommodate and care for her children in her new home beyond asking her sister to move out.

The circuit court conducted an extensive hearing, during which it heard testimony not only from DSS but also from mother. The circuit court concluded that there was clear and convincing evidence that the children suffered neglect or abuse and that this neglect or abuse

- 11 -

presented a serious and substantial threat to their life, health, or development. Here, the evidence, viewed in totality, supports the circuit court's finding.

B. Substantial Correction or Elimination of Conditions

Mother also contends that the evidence was insufficient to find that it was not reasonably likely that she could substantially correct or eliminate the conditions which resulted in her children's neglect or abuse, so as to allow their safe return to her within a reasonable period of time. See Code § 16.1-283(B)(2). Again, mother concedes that during the early period of DSS' involvement with her family, there were neglectful conditions in her home which "either did, or if allowed to continue, would have led to neglect or abuse." However, as above, she then argues that "there are two distinct periods in this case"—the period when mother and her children were living with their extended family, and the period after the children were placed in foster care when mother was living largely by herself. Mother again alleges that the physical conditions which brought DSS involvement and assistance ceased to exist after mother moved to her own home, and thus the circuit court erred in finding that conditions of abuse or neglect still existed.

Code § 16.1-283(B)(2) provides, in pertinent part, that

> Proof of any of the following shall constitute *prima facie* evidence of the conditions set forth in subdivision B 2:
> a. The parent or parents have a mental or emotional illness or intellectual disability of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development . . . .

Here, as noted above, mother's psychological evaluation indicates that she suffers from moderate to severe intellectual disabilities and that her cognitive and emotional functioning and life skills are significantly impaired. She has a limited ability to adapt. Also limited by her cognitive deficiencies are mother's conceptual skills and her understanding of written language and concepts involving numbers, time, and money. Further, she has a limited ability to organize such

- 12 -

aspects of family life as schedules and plans for meals. In the examining psychologists' opinions, mother will require significant support to assist her with problem-solving throughout her life.

Thus, the record clearly supports that mother's intellectual disabilities are severe enough to constitute *prima facie* evidence, under Code § 16.1-283(B)(2)(a), that there is no reasonable expectation that she will be able to undertake responsibility for the care needed by her children. And mother fails to rebut this evidence. She argues that her living circumstances have improved since DSS first became involved with her family. While mother no longer lives in as crowded a household, DSS reported that even after her move, mother proved unable to correct major deficiencies in her living circumstances. While living in her own home, she has proved unable to consistently provide basic necessities, such as running water and adequate heat. Her new home was unclean and unhygienic. At the time of the termination hearing, after more than a year in her new residence, mother still did not control her own finances or have regular employment. Her only preparation for undertaking responsibility for the care of her children, some of whom have special needs, consisted of telling her sister that she would have to move out of the home if her children were returned to her. Thus, the changes in mother's physical environment have not "substantially corrected or eliminated" the "conditions which resulted in [the] neglect or abuse" of her children. Code § 16.1-283(B)(2). Here, the evidence, viewed in totality, clearly supports the circuit court's finding.

## III. CONCLUSION

The factual findings underlying the circuit court's order terminating mother's residual parental rights were neither plainly wrong nor without evidence to support them. Thus, we affirm the circuit court's decision terminating mother's residual parental rights.

<u>Affirmed.</u>